40 So.2d 725

## GOLSON v. STATE.

### 6 Div. 564.

Court of Appeals of Alabama.
April 5, 1949.

Rehearing Denied May 3, 1949.

Beddow & Jones and G. Ernest Jones, Jr., all of Birmingham, for appellant.

A. A. Carmichael, Atty. Gen., and Thos F. Parker, Asst. Atty. Gen., for the State.

**HARWOOD, Judge.**

This appellant has been convicted of manslaughter in the first degree, and her punishment fixed at imprisonment in the penitentiary for a term of five years. The indictment on which she was tried charged murder in the first degree.

The victim of this killing was appellant's husband.

It is clear from the record that the ultimate tragedy about which this case centers was the culmination of years of marital dis·harmony.

In the trial below the defendant entered a plea of not guilty, and not guilty by reason of insanity.

The killing occurred in the home occupied by appellant and deceased, and their twin daughters, four years of age.

Other than the appellant there were no eye witnesses. Beyond the undisputed fact that appellant did shoot the deceased, firing some six shots, the State was compelled to rely on circumstantial evidence to establish the elements of the offense for which appellant was convicted. That these elements were so established is abundantly clear.

The evidence presented by the State tended to show that the appellant in October 1946 had inquired of two lady employees in an insurance office concerning the double indemnity clause in an insurance policy on the life of her husband, and had then stated "My mother is a corpse at Rideout's now, and he is out with another girl, and I can't stand it."

In November, 1946, appellant bought a pistol.

In the latter part of November, 1946, the appellant told Mrs. Julian Ribera, an acquaintance, that she had a gun, and, according to Mrs. Ribera, "She said no jury in the world would convict her of murder if they found out the way he was running around with that slut. She said, 'All I would get would be five or maybe ten years, and with two, or three years off for· good behavior, I would be out in no time, and that girl couldn't get him.' But she was hysterical."

About two weeks before Easter, 1947 Mrs. Ribera again saw appellant and asked if things were any better at home. Appellant began crying and replied "I just worship the big lug. Sometimes I think I would rather shoot him than give him up."

J. H. Mitchell, a police officer of the City of Homewood, was one of the principal witnesses for the State. He arrived at the Golson home shortly after the shooting, in response to a message received on his patrol car radio.

Upon entering the house officer Mitchell found the deceased lying on the floor of the dining room, near a door leading to the kitchen. The appellant was kneeling ·near his head and rubbing it. The deceased was asking for something to "knock him out," and appellant went to look for some medicine or drug, but was informed by the officer she could not administer such. The appellant then asked deceased if he would forgive her, and deceased replied: "I forgive you of everything. It is all my fault. I have brought this on."

An ambulance arrived in a few minutes· and the deceased was removed to a hospital.

Officer Mitchell stated that he found an ottoman in the hallway overturned, a rug in the dining room disarranged and ruffled up, and some broken glass from a frameless picture on the floor of the hallway in the vicinity of the telephone. There were also some small splatters of blood in the hallway, and also in the kitchen and breakfast room.

Appellant told officer Mitchell that the deceased had chased her all over the house before she shot him, and pointed out to him route their melee had taken. When questioned as to the broken glass the appellant said she had at one time tried to call her father over the telephone, and deceased

had taken a frameless glass picture from a cabinet nearby and hit her with it. She had then tried to place the ottoman in his path to trip him. Appellant had gone into the kitchen, and had shot deceased as he was "right on her."

Officer Mitchell gave further testimony as to the location of bullet holes or scars in the walls, and on the refrigerator.

We will observe here, in connection with a later occurrence in regard to officer Mitchell, that in so far as is disclosed by a careful reading and consideration of his testimony, nothing is reflected by this record in any way indicating that this police officer was in anywise an unwilling or hesitant witness, but on the other hand it appears that he answered, or attempted to answer fully and clearly all questions propounded to him.

For the defense the appellant testified in her own behalf. Her testimony tended to show that the marriage between her and the deceased had been an unhappy alliance for years. The deceased had on more than one occasion committed physical violence on her, and had engaged in frequent affairs with other women.

On the day of the homicide the deceased came home shortly before 3:00 P.M. Appellant was seated in the kitchen preparing some trinkets to go in the Easter baskets of the twin daughters. She was using a pair of scissors in this connection.

Appellant requested the deceased to take the twins to an Easter party that afternoon. The deceased at first refused, but later reluctantly agreed to do this.

Upon deceased's return from this errand the appellant took the trinkets and scissors and sat at the table with him while he ate a lunch. Thereupon a conversation ensued in which deceased asked appellant: "Well, why don't you raise some hell with me because I was Late?" "Why don't you want to know where I have been?" to which appellant replied: "I don't have to ask."

Further conversation ensued in which deceased again asked appellant why she did not raise hell and ask him where he had been, and to which appellant replied that she knew. Deceased replied that appellant was damn right, that he had been out with Barbara, and was going when he wanted to.

Appellant testified that at this point deceased reached across the table, took her by the wrist, and stated, "Well, I still want that divorce." Upon her replying there would be no divorce, they were going to make the best of it, deceased replied: "You won't have to, I am going to kill you right now." Deceased then picked up the scissors with his free hand. Appellant jerked loose and ran into the hall, stating she was going to call her father. The deceased followed her, caught her dress and tore it, and told her: "You won't have to call him, I am going to kill you right now."

Appellant claims when she reached the phone she picked up the frameless glass picture from a nearby stand, and attempted to protect herself from deceased's assault with it. The deceased continued hitting her, breaking the glass with the scissors. Appellant replaced the phone and backed toward the kitchen, the deceased following her and continuing his threats. After entering the kitchen appellant took the gun from a drawer in a cabinet, turning around and fired it without aiming and with her eyes closed.

Other evidence was presented by both the State and the defense. We have not set it forth because the above we think is background sufficient for the purpose of this opinion.

■ We come now to a consideration of the action of the Solicitor in recalling for further examination the State's witness, officer H. L. Mitchell, pertaining to his conduct in permitting defense counsel to see and read the report of his investigation made by him to the Solicitor's office.

No surprise was pleaded by the Solicitor prior to his reexamination of this witness. Actually, however, this reexamination was in the form of a rather severe cross examination. We pretermit considering the question in its aspect of an unwarranted cross examination of one's own witness, however, for in our opinion this procedure in its broader aspects created a prejudicial

atmosphere against the defendant and her counsel probably materially injurious to her cause.

Upon this redirect examination Mr. Mitchell first identified a paper handed to him as being a copy of the written report of his investigation, made by the witness and a Mr. McDuff. He then testified that he had let Mr. Beddow of defense counsel see this report.

There then ensued a series of questions, objections, answers, and colloquy between respective counsel, and the court, covering some 10 or 11 pages of this record.

The following excerpts are quoted to illustrate our conclusions hereinafter reached:

"Q. I will ask you, did you give your copy of this report to Mr. Beddow, the attorney for the defendant? A. I let him have it, yes, sir.

"Q. When? A. Saturday.

"Q. Is that customary in a case of this kind?

"Mr. Beddow: We object to that. It is just as much our right to see a copy as it is anybody else's right. We have a right to prepare a defense as they have to prepare a prosecution.

"The Court: Wait a minute.

"Mr. Beddow: We object to it. It calls for a conclusion. It calls for illegal, irrelevant, incompetent, and immaterial testimony, and he is attempting to make it appear that there was something wrong one way or the other.

"The Court: Read the question, Mr. Williams.

"(Thereupon the Court Reporter read the last question propounded as above recorded.)

"The Court: Answer it.

"A. I don't know.

"The Court: Anything further?

"Mr. Jordan: Yes, sir.

"Q. I would like to know if you had any interest in this case? A. Nothing in the world, other than justice to be had, one way or the other, for all.

"Mr. Beddow: That is his business. A. No interest.

"Mr. Jordan: It is supposed to be.

"The Court: Both of you are out of order. It would be just as easy to do it right. Anything further?

"Mr. Jordan: Read the last question and answer, Mr. Reporter.

"(Thereupon the Court Reporter read the question and answer last propounded as above recorded.)

"Q. Did you inform the Solicitor's Office, or anyone else that you were giving to the defense the report of the investigation of this case?

"Mr. Beddow: We object to that on the grounds—

"The Court: Let him answer.

"A. I did not.

"Mr. Beddow: —Wait a minute—on the grounds that it calls for illegal, irrelevant, incompetent, and immaterial testimony.

"The Witness: I—

"Mr. Beddow: Wait a minute. We object on the grounds that it is an attempt to cross examine his own witness, and attempt to discredit his own witness, and to disparage his own witness.

"The Court: His answer is 'no.' Leave it in.

"Mr. Beddow: Exception.

"Q. Why didn't you?

"Mr. Beddow: We object to that question on the grounds that it is illegal, irrelevant, incompetent, and immaterial. It calls for an illegal conclusion, and an illegal opinion. We object to it as it is argumentative.

"The Court: Let him answer it.

"A. I did not think that I was doing anything wrong.

"Q. Have you ever done that before?

"Mr. Beddow: We object to that—

"The Court: Let him answer it.

"Mr. Beddow: Judge, would you be kind enough to let me get my grounds in? It is illegal, irrelevant, incompetent, and immaterial. It is argumentative. It calls for

testimony that invades the province of the jury. It is an attempt to discredit his own witness, and an attempt to cross examine his own witness.

"The Court: Answer it.

"The Witness: Sir?

"The Court: Answer it.

"Mr. Beddow: Exception.

"A. I never had any experience with a case like this before. I have never been instructed one way or the other.

"Q. On any other case in which the City of Homewood of the State of Alabama is the prosecutor, in which you are the investigating officer, and in which you make the arrest, have you been in the custom of providing a report of your investigation to the defense.

"Mr. Beddow: Just a minute. We object to that on all the grounds assigned to the last question, and on each of the grounds separately and severally.

"The Court: Let him answer.

"Mr. Beddow: Exception.

"A. I have forgotten the question.

"Mr. Jordan: Read the question.

"(Thereupon the Court Reporter read the question last propounded as above recorded.)

"A. We have given that information several times on our cases.

"Q. You have done that? A. Yes, sir.

"Q. Have you made that fact known to the governing body of the City of Homewood, that you were doing that?

"Mr. Beddow: We object to that on the grounds that it is argumentative. It calls for testimony that would invade the province of the jury. It calls for an undisclosed mental operation on the part of the witness. It calls for a custom. It is asking this witness if he is opposed to doing a certain thing if he is under no duty to do it. It is an attempt to discredit his own witness and to disparage him.

"The Court: Let him answer it.

"The Witness: What was the question?

"The Court: Read the question, please.

"(Thereupon the Court Reporter read the question last propounded as above recorded.)

"A. My superior officer. I have been with him when we have done that.

"Q. Who is he? A. Chief Scott. We have done that. Chief Scott, my superior officer.

"Q. Now, I would like to know if you had any interest, or bias?

"Mr. Beddow: We object to that. It has already been asked and it has already been answered. It is cross examination of his own witness. It is an attempt to impeach his own witness.

"The Court: He has been asked that before.

"Mr. Jordan: Now he is being asked if he had any bias in the case.

"The Court: Have you?

"The Witness: No, sir."

The witness then testified that he had appeared as a witness before the grand jury, but had not told Mr. Beddow what his testimony before that body was. The record then shows the following:

"Mr. Jordan: Your Honor, the State, at this time, would offer to present to Mr. Beddow the copy of the Grand Jury notes, all of the testimony taken in this case; and the State also offers to admit into evidence the testimony—

"Mr. Beddow: We object to that.

"Mr. Jordan: Let me make the statement, please, sir. All of the testimony taken before the Grand Jury, and also offers to admit into evidence all the testimony contained in the report, which Mr. Mitchell states that he delivered to Mr. Beddow.

"Mr. Beddow: We object. That is an improper offer on the part of the Solicitor, and we request the Court to instruct the jury that it is an improper statement; that the Grand Jury notes in this case would not be proper to have in this case; that his offer was an attempt to [put] us on the spot. It is an attempt to create the impression that we were denying the jury evidence, and we ask the Court to instruct the jury to pay no attention to that statement of counsel.

"The Court: Overruled.

"Mr. Beddow: Exception. I want to say something. I want to ask the Court, in

view of what I conceive to be misconduct on the part of counsel representing the State, and in view of the things that he has said, and in view of the testimony embraced in this report which he has passed over here in front of me, and the Grand Jury notes, and in view of the other contentions that he has manifested with regard to the honesty of the investigation of this case before you, I am going to move that the Court, because of the impassioned conduct of counsel, and the attempt to prejudice the rights of this defendant, declare a mistrial.

"The Court: Overruled.

"Mr. Beddow: Exception. And I might say, Your Honor, that as long as I have practiced law, I have been making, and I am going to continue to make all the investigation I can, as long as it is right, and as long as it is on the level and within the law.

"The Court: Let us reserve argument.

"Mr. Beddow: And nobody is going to stop me from doing it.

"The Court: Anything further?"

\* \* \* \* \* \*

"Mr. Jordan: It was this witness's testimony Mr. Beddow wanted. He wanted it all, and he has got it all. The State is ready to proceed when the Court so directs and is willing to proceed at this time. Your Honor, I would like to again renew my offer that I made when I gave these papers to Mr. Beddow.

"Mr. Beddow: We object. He is now arguing, trying to get us to agree to the introduction of the Grand Jury notes here, without giving the defense an opportunity to cross examine the witness. The defendant did not have any attorney in the Grand Jury. Now, he knows that is improper and an invasion of the defendant's rights to be confronted with this, but he is very sanctimoniously creating the impression that it would be proper evidence.

"The Court: Oh, well.

"Mr. Beddow: We ask the Court to instruct the jury that it was an improper remark. That is not the proper way to try a murder case. We ask the Court to instruct the jury that the defendant has a right to have witnesses on the stand and cross examine them, and it was improper in the solicitor to insinuate that the defendant ought to permit testimony taken at another time and place, without her having the opportunity to cross examine.

"Mr. Jordan: She may in this case.

"The Court: I assume there is an offer made. Will you answer?

Mr. Jordan: We would like to ask the Court to instruct the jury to pay no attention to the gentlemen's remarks.

"The Court: May I have a reply to the offer?

"Mr. Beddow: Will Your Honor instruct the jury that it was an improper offer?

"The Court: No, sir.

"Mr. Beddow: Exception."

The record shows the following highly prejudicial question asked at the conclusion of the examination of this witness:

"Q. Now, have you conspired with the defendant in any other way in this case, other than the supplying of the defense counsel with a copy of Department of Public Safety's investigation?

"Mr. Beddow: Just a minute. We object to that on the ground that it assumes that he has accommodated me, and that calls for illegal, irrelevant, incompetent, and immaterial testimony. It calls for an illegal conclusion and an illegal opinion.

"The Court: Well, in that form, leave it out."

While the court did not permit the question to be answered, the phraseology of its ruling did not disabuse the jury of the highly prejudicial insinuation connoted in the question. Had this question stood alone, we would not have commented upon it. In view of the entire and lengthy colloquy preceding it we do feel however that even in the state of the record, i. e. the absence of a motion for a mistrial, it has a place in this review.

■ It cannot be argued but that the method pursued by the Solicitor in the re-

direct examination of officer Mitchell tended strongly to create an impression by insinuations and innuendoes, that the defense counsel had done an improper and reprehensible act in interviewing this State's witness.

■ Such activity on the part of defense counsel was not improper. This court, in a Per Curiam opinion in the case of Gallman v. State, 29 Ala.App. 264, 195 So. 768, 770, has clearly set forth the right, and indeed the duty, of defense counsel, in preparing his client's case for trial. We quote the portions of that opinion pertinent to this cause:

"It is a mistake of a serious nature for a trial court, or opposing counsel, to assume or intimate that counsel for the defendant is not at full liberty to question, whenever he sees fit, any person who knows or is presumed to know the facts attendant upon the commission of the offense with which his client is accused. It is his solemn, sworn duty to ascertain, as far as he can, what the evidence is, and his duty is not at an end when he has examined, no matter how exhaustively, his client; he must see and talk with the witnesses. Sharwood's Legal Ethics, p. 121; Elliott's General Practice, Chapt. 1, Sections 1-5; Chitty's Practice, Vol. 2, pages 21 and 53.

"The rule is well stated in a North Carolina case, State v. Williams, 91 N.C. 599, in the following language: 'It is competent for the prisoner or his counsel to converse with any one supposed to have knowledge of the offense imputed and ascertain the facts so known. A party, even when the state is such, cannot by first summoning a witness deprive the other party, or the accused, of the testimony of the witness when favorable, nor of an opportunity of ascertaining what information he may possess, before putting him on the stand, as he might do should the state decline to introduce and examine him. His information ought to be sought and obtained voluntarily and fairly from the witness, and not by what he may deem to be a constraint.'

"To the same effect, we think, is the case of Wireman v. Commonwealth, 211 Ky. 495, 277 S.W. 822.

"If the defendant had the right to confer with the witness, Jordan, at all, he had the right to such conference in the absence of any intimidating influences whatever. The defendant, himself, had no right to the information of the witness except that which he, voluntarily and fairly, was willing to give. If counsel for the defendant abuses his right in obtaining the true and voluntary statement of a witness with reference to the facts deemed relevant upon the trial of the case then such counsel is amenable to the statutes of this State prohibiting the bribery, or intimidation, of witnesses and other specified improper conduct in connection therewith."

■ The grand jury notes in the hands of the Solicitor, being hearsay in character, were of course not admissible in evidence. The Solicitor's tender of these notes to defense counsel in the presence of the jury, with a statement that the State would agree to their introduction, was improper. The defense's motion that the jury be so instructed was well taken. That the defense was put in a disadvantageous position by such conduct is obvious. It is our conclusion therefore that the court erred in refusing the defendant's motion that the jury be instructed that such action by the Solicitor was improper.

■ During his argument to the jury the Solicitor stated:

"Mr. Mitchell has failed to do his duty. Mr. Mitchell failed to make the original investigation in a workman like manner, and the State Department of Investigation found it necessary to do it for him."

The defendant objected to the above argument on the grounds, among others, that "the statement was not a reasonable inference springing out of any evidence in this case. The evidence shows that he and McDuff went together and got the evidence," and that the argument was made for the purpose of prejudicing the defendant.

Other than officer Mitchell's statement that he and Mr. McDuff made the investigation of this case together and that their report was written up by the Bureau of Investigation in Montgomery, there is noth-

ing in this record indicating the extent of Mr. McDuff's participation in the investigation. Certainly the record is devoid of any evidence that Mr. McDuff's participation was necessitated by the inefficiency of officer Mitchell, or that the State Department of Investigation found it necessary to make the investigation. The above argument was therefore clearly beyond the record. Even though officer Mitchell was a State's witness the tendency of some portions of his testimony was favorable to the defendant. The probability of injury to defendant's cause by the above unwarranted argument is therefore real and substantial. We conclude therefore that the court's action in overruling defendant's objection to the above argument, which ruling was duly excepted to, by the defendant, was erroneous.

For the above reasons it is our conclusion that this cause must be reversed. Numerous other points are argued in appellant's brief. We see no probability of their arising in another trial of this cause. We therefore, in the interest of brevity, reserve consideration of these points.

Reversed and remanded.

CARR, J., concurs in conclusion.