309 So.2d 489

**John Henry RUSSELL**

v.

**STATE of Alabama.**

**5 Div. 218.**

Court of Criminal Appeals of Alabama.

Aug. 13, 1974.

Rehearing Denied Oct. 1, 1974.

**453**

Richard D. Lane, Auburn, for appellant.

William J. Baxley, Atty. Gen., and Kent Brunson, Asst. Atty. Gen., for the State.

BRADLEY,[1] Judge.

Appellant was convicted of murder in the second degree and was sentenced to serve thirty-five years in the state penitentiary. The appeal is from that judgment.

Prior to trial a copy of the indictment along with a copy of the venire containing one hundred names of prospective jurors was served on appellant. Included in the list were the names of Lee P. Hale and Marilyn V. Fuller.

When the roll of summonsed jurors was called in open court on the day of the trial, Lee P. Hodge answered when the clerk called Lee P. Hale and when the clerk called Marilyn V. Fuller, Vera Fuller answered.

Based on the contention that the two summonsed jurors were not the same

---

1. On temporary assignment to the Court of Criminal Appeals by order of the Chief Justice of Alabama dated July 3, 1974.

jurors as were drawn and listed on the venire served on him, appellant moved to quash the venire.

After a hearing on the motion at which time the two jurors in question testified, the trial court overruled the motion to quash and struck the two jurors' names from the venire and dismissed them. No objection was made to the court's action in striking the two jurors' names from the venire. However, appellant does question the court's denial of his motion to quash.

Title 30, Section 46, Code of Alabama 1940, as Recompiled 1958, provides that no objection can be made to the jury venire except for fraud in the drawing or summoning the jurors. There is no allegation in the motion charging fraud in the drawing or summoning of jurors in the instant case.

However, appellant maintains that Lee P. Hale and Marilyn V. Fuller should have been summonsed if they exist. If they do not exist, there was error in listing these names on the venire.

The evidence taken in support of the motion to quash could easily have been construed as supportive of the theory that a clerical mistake had been made and that the two jurors summonsed were in fact the ones that were drawn. Bone v. State, 8 Ala.App. 59, 62 So. 455; Reed v. State, 18 Ala.App. 371, 92 So. 513.

In Frost v. State, 225 Ala. 232, 142 So. 427, a similar situation to that at bar existed and the trial court gave defendant the choice of retaining the juror summonsed or striking him from the venire. When defendant declined to elect, the court struck the juror from the list. Defendant excepted to the striking of the juror from the list and the denial of the motion to quash, but he failed to move or request that the trial be postponed until the juror drawn could be served and brought into court to serve. For such failure no reversible error infected the trial court's action in striking the juror from the venire and overruling the motion to quash.

In the case at bar, appellant made no objection to the trial court's action in striking the two names from the venire nor did he request a postponement of the trial until such time as the two persons named on the venire could be served and brought into court.

We find no reversible error in the trial court's action in denying the motion to quash.

Appellant next contends that the trial court erred in overruling his objection to the admission into evidence of testimony by Mr. Roper, an assistant state toxicologist, concerning an analysis of a sample of defendant's urine received from the Opelika Police Department.

The evidence shows that Mr. Roper received a manila envelope from Mr. Dan Davis of the Opelika Police Department, containing a specimen of urine. The specimen allegedly was obtained from the appellant.

Appellant says that the admission into evidence of Mr. Roper's testimony concerning the analysis of the urine and its alcoholic content violated his fifth amendment rights not to be a witness against himself, his sixth amendment rights to the advice of counsel, and his fourth amendment rights against an unreasonable search and seizure, and as authority for such contentions, cites us to the case of Schmerber v. State of Cal., 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

In *Schmerber* a sample of the defendant's blood was taken by the attending physician in the emergency room of a hospital. The defendant was in the hospital as a result of an automobile accident. The defendant was advised by counsel not to consent to the taking of a blood sample, but it was taken anyway by the doctor at the direction of a police officer. The blood sample was taken to determine the alcoholic

content of Schmerber's blood at the time of the accident.

Schmerber contended that the taking of the blood was an unreasonable search and seizure and violated his fourth amendment rights; that the taking of the blood sample required him to be a witness against himself and thereby violated his fifth amendment rights; and that the refusal by the authorities to abide by the advice of his lawyer—he had talked to his lawyer on the telephone prior to the taking of the blood sample by the attending doctor—violated his sixth amendment rights.

The U. S. Supreme Court concluded that the taking of the blood sample and the admission in evidence of the analysis thereof was not a violation of Schmerber's fifth amendment rights because the defendant had not been required to give evidence against himself of a testimonial or communicative nature. The court likened the blood sample evidence to the use as evidence of fingerprints, photographs, or requiring the defendant to stand, walk, speak or write. It said the extraction of the blood and its subsequent analysis did not involve defendant's testimonial capacities in any way and did not violate his fifth amendment privileges.

Likewise, the Supreme Court stated that inasmuch as no issue of counsel's ability to help defendant with any rights he possessed was presented, there was no violation of his sixth amendment rights.

The defendant, Schmerber, also contended that his fourth amendment rights had been violated. The Supreme Court found that the blood sample was taken as an incident to a lawful arrest—Schmerber had been arrested for a felony prior to the taking of the blood sample—and that the officer directing the extraction of the blood from Schmerber reasonably could have believed that he was faced with an emergency due to the nature of the evidence being sought. The evidence had shown that alcohol in a person's body begins to oxidize from the moment of ingestion and due to

lapse of time would disappear from the body. Also, the test used to establish the alcoholic content of Schmerber's blood was a reasonable one. Based on the above findings, the court then held that there had been no invasion of defendant's fourth amendment rights.

In the case at bar, the appellant objected to statements being elicited from the assistant state toxicologist as to the results of his analysis of a sample of urine purportedly obtained from appellant by the Opelika Police Department. According to the record, the toxicologist had no knowledge of the method or methods used by the police to obtain the specimen of urine from appellant. All he knew was that he had a specimen of urine purportedly obtained from the appellant along with a request from the police that it be analyzed for its alcoholic content. Such analysis was made and it showed a .17% blood-alcoholic content.

The presence of alcohol in a person's body can be ascertained by a urinalysis as well as by a blood analysis. (See 3 Lawyers Medical Cyclopedia § 24.10, For Comparison of Alcohol Levels in Body Fluids and Tissues.)

There were no objections interposed or evidence introduced to show the manner or method used by the police to obtain the urine specimen and there were no contentions made that the police had forcibly obtained the urine from appellant nor denied him the right to counsel with a lawyer prior to the giving of the specimen.

As to appellant's contention that his fifth and sixth amendment rights had been violated, we would say only that the urinalysis is not evidence of a "testimonial or communicative nature" and is not protected by the fifth amendment. Schmerber v. State of Cal., supra. Likewise, since appellant's lawyers' ability to help him with any constitutional rights he did possess was not presented, there was no sixth amendment violation. Schmerber v. State of Cal., supra.

■ As to the argument that there was a violation of appellant's fourth amendment rights, we note that there is a total absence of evidence showing when and under what circumstances the police obtained the urine specimen from appellant; therefore, no assessment can be made of the validity of appellant's claim that his fourth amendment rights had been violated.

Furthermore, there is no evidence in the case at bar that would indicate that the urine specimen obtained from the appellant was not obtained and analyzed in such a manner as to meet all of the constitutional tests set out in *Schmerber*.

We conclude, therefore, that the rationale of *Schmerber* would apply as well to a urinalysis as it does to a blood analysis, since both are accepted methods for determining the alcoholic content of a person's body, and the trial court did not err in allowing the assistant state toxicologist to testify about the analysis of appellant's urine and its alcoholic content.

■ Appellant says next that the trial court erred in admitting into evidence the knife found on the appellant shortly after his arrest. We cannot agree.

The evidence shows that on the night Williams was killed, appellant was at the house of Johnnie Mae Foster, a sister. He left this sister's house about nine p. m. in a taxi to go to the home of Blanchard Williams and arrived at Williams' house a little after nine p. m. He returned to Johnnie Mae Foster's house about ten p. m.

Lizzie Mae Russell, the common law wife of Williams, testified that her brother, the appellant came to the house where she and deceased lived about nine p. m. on the night in question and shortly after he arrived started cursing the deceased. The verbal attack started on the porch and continued after they went inside to the kitchen. Appellant and Williams later went back onto the porch. When Lizzie Mae Russell went out on the porch, she saw appellant pulling a butcher knife out of Williams'

back. Williams tried to go back into the house but fell in the doorway. The appellant stepped off the porch and walked off down the street.

James Ashmore, who was present at deceased's house that night testified he saw appellant out on the ground away from the porch. The deceased was lying on the porch near the entrance to the house. Ashmore said he heard the appellant curse the deceased, and then appellant walked off down the street with a butcher knife in his hand.

After returning to his sister, Johnnie Mae Foster's, house about ten p. m. that same night, appellant told her that he had killed Blanchard Williams. About thirty minutes later the police arrived and arrested the appellant. At this time a butcher knife was found on the appellant.

Johnnie Mae Foster testified that she saw the knife in one of appellant's socks after he returned to her house that night around ten p. m.

The admission into evidence of the butcher knife for whatever value it might be to the jury was without error. Lewis v. State, 220 Ala. 461, 125 So. 802.

Appellant says next that there is a material variance between the name of the deceased as alleged in the indictment and as proved by the evidence.

■ An indictment charging murder must name the deceased with such certainty as to fully apprise the accused of the person whose death he is charged with causing, but where the indictment identifies the deceased by the name by which he was known in the community where he lived, although it is not his true name, no material variance is shown. Roberts v. State, 25 Ala.App. 477, 149 So. 356.

The indictment in the case at bar charges appellant with having killed "Blanchard Williams" by stabbing him with a knife.

Detective Vance Abbett of the Opelika Police Department testified that he had been a policeman in Opelika for about seven years and had known the deceased four or five years and knew him as Blanchard Williams, J. B. Williams, Jahue Blanchard Williams and Jahue Williams.

During his testimony, James D. Ashmore referred to the deceased as Blanchard Williams. He also stated that he had known the deceased for about five or six years and had always called him Blanchard. He stated he had heard other people refer to Blanchard as J. B.

Lizzie Mae Williams, the deceased's common law wife, stated that she had been living with Blanchard about eleven years. She referred to the deceased during her testimony as J. B., but she also stated that she knew him as Blanchard and heard others call him Blanchard.

She stated that she knew Blanchard as Jahue B. Williams, which was his true name. Also she had heard him referred to as John Blanch Williams.

Johnnie Mae Foster testified that she had heard other people refer to deceased as Blanchard Williams, but she called him J. B.

The motion to exclude the state's evidence on the ground of a material variance between indictment and proof was properly overruled.

There were requested charges and grounds in the motion for new trial also raising the question of a variance between the pleading and the proof. These were also refused by the trial court without error.

■ The final objection made by appellant to his conviction relates to the closing argument of state's counsel wherein it was stated that the knife introduced into evidence was jabbed into the deceased's back and he died. Appellant objected on the ground that there was no evidence that this was the same knife that was jabbed into deceased's back. The objection was sustained and the trial jury instructed to disregard the statement. The motion for a mistrial was then overruled.

Appellant says this argument was calculated to inflame the jury and was so improper and prejudicial that the trial court's admonishment to the jury to disregard the statement did not wipe out the prejudice inflicted upon him by such argument.

In Wilson v. State, 39 Ala.App. 77, 94 So.2d 408, the Court of Appeals of Alabama said that the closing argument of the prosecutor was improper because it was not supported by the evidence or reasonable inferences to be gleaned therefrom, but, due to the strong admonishment given to the jury by the trial judge that the statement made by the prosecutor was not evidence and, where unsupported by the evidence received from the witness stand, was to be disregarded, no reversible error infected the action of the trial court in overruling the objections made thereto.

In the case at bar the trial judge sustained the objection and admonished the jury to disregard the statements made by the prosecutor relating to the knife. The trial judge again in his oral instructions to the jury pointed out that they were to consider only the evidence coming to them from the witness stand and no other. In view of the explicit instructions given to the jury in regard to these statements, we do not believe that appellant was prejudiced by the argument of the prosecutor.

No reversible error being discovered after a careful search of the record, the judgment of the trial court is affirmed.

Affirmed.

WRIGHT, P. J., HOLMES, J. (Ct.Civ. App.), and TYSON and HARRIS, JJ., concur.