366 So.2d 296 (1978)
Lawrence Glenn HILL
v.
STATE.
8 Div. 947.
Court of Criminal Appeals of Alabama.
April 18, 1978.
Rehearing Denied May 16, 1978.
*299 Joe M. Berry of Cloud, Berry, Ables, Blanton & Tatum, Huntsville, for appellant.
William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State, appellee.
TYSON, Judge.
Lawrence Glenn Hill was indicted for "unlawfully killing Mark B. Pizitz by perpetrating an act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life, although without any preconceived purpose to deprive any particular person of life by, to-wit: operating a motor vehicle while under the influence of intoxicating liquors or narcotic drugs along the highway, and while operating the said motor vehicle under the influence of intoxicating liquors or narcotic drugs did run the motor vehicle in which the said Lawrence Glenn Hill was driving, over, upon, into or against the motor vehicle in which the said Mark B. Pizitz was a passenger and as a proximate cause thereof, unlawfully killed the said Mark B. Pizitz, against the peace and dignity of the State of Alabama." The jury found the appellant guilty of manslaughter in the first degree and fixed his punishment at imprisonment for eighteen (18) months. On September 1, 1976, the trial court entered judgment in *300 accordance with the jury verdict. Appellant's motion for new trial was denied following a hearing thereon. Hence this appeal.
Around 12:15 A.M. on Saturday, January 10, 1976, a 1975 Grand Prix Pontiac operated by appellant collided with a 1973 Ford station wagon being driven by David Tarrant Lee. Mark Pizitz, age 15, was a passenger in the Lee vehicle. As a result of overwhelming head injuries sustained in the collision, Pizitz died fourteen hours later in the Huntsville Hospital.
The collision took place in the area of the Whitesburg Drive-In Theatre. According to the testimony of David Lee, he had turned north (left) onto Whitesburg Drive (a four lane highway with a center turn lane) from Airport Road. As he approached the drive-in theatre, he noticed a small car with its emergency lights flashing parked in the exit driveway. Lee stated that he intended to stop to see if he could render assistance but that when he "put his foot on the brake something hit [him]." He did not know which northbound lane his car was in when the collision occurred, but he was in the inside left lane when he turned onto Whitesburg Drive. Lee acknowledged that he had made a prior statement that he never, at any time, entered the right northbound lane of traffic.
Michael Gunter and Deborah Moore were traveling north on Whitesburg Drive in Gunter's automobile at the time of the collision, and both were eyewitnesses to the collision. Gunter testified that just before the collision, appellant passed his automobile at a speed of about eighty miles an hour. When appellant came up behind the Lee station wagon, which Gunter stated was traveling in the outside (right) lane, the car made "a quick right like it was trying to pass" and the rear end of the car hit the curbing of an island in front of the theatre, causing appellant's car to veer back to the left into the side of Lee's station wagon.
Mr. A. O. Pipkin, Jr., a crash reconstruction expert, postulated that appellant's initial contact with the Lee vehicle occurred in the outside northbound lane near the exit driveway of the theatre as indicated by a gouge or rim mark in that area; that both vehicles were traveling "practically straight ahead" in the outside northbound lane at the time of impact; that appellant ran up on the Lee vehicle from behind and hit it in the right rear bumper area; and that the angle of impact between the two vehicles was 180 degrees.
The force of appellant's car and the spinning action of Lee's station wagon after impact caused the entire right side (from the rear right wheel forward) of Lee's station wagon to be ripped away from its frame. The evidence further showed that while the Lee vehicle was in a counter clockwise spin, Pizitz was thrown from the automobile onto the highway. The Lee vehicle came to rest in the center turn lane facing south. Upon separation of the two cars after impact, appellant's car went over the curbing immediately north of the exit of the drive-in, traveled about 60 feet on the grassy area along the highway, touched back down on the highway, and stopped in the northbound lane approximately 188 feet from the point of impact. Lee was not injured in the collision. Appellant sustained a cut on the forehead; appellant's wife, who was riding with him at the time of the collision, received minor facial lacerations.
Lee admitted that both he and Pizitz had consumed alcoholic beverages a short time before the accident. He drank two beers at a Huntsville nightclub around 10:00 P.M. and later, around 11:00 P.M., consumed a lime daquiri at the home of a friend. An alcohol blood analysis test conducted a short time after the accident revealed the level of alcohol in Lee's blood to be .09 percent.
Appellant and his wife had attended a housewarming party earlier in the evening. While there appellant consumed several beers and a mixed drink. The couple were on their way home from this party when the accident occurred. Several witnesses at the scene who came in contact with appellant shortly after the accident testified that they were of the opinion that appellant was intoxicated and that appellant acted in a *301 very uncooperative manner when offered on-the-scene emergency treatment.
At the Huntsville Hospital emergency room, approximately one hour after the collision occurred, appellant was advised that he was under arrest for driving while intoxicated. He was requested "on more than ten occasions" to submit to either a blood alcohol test or a breath test and informed that his failure to do so would result in the possible loss of his driver's license for a period of at least forty-five days. The appellant initially indicated that he would take a blood alcohol test upon the condition that his personal physician withdraw the blood. An effort to get appellant's physician to the hospital was unsuccessful, and subsequent requests by police officers to submit to a blood test were refused; the appellant repeatedly stated that "he was scared" and that he wanted first to talk with his doctor or lawyer before signing a consent form.
Appellant was thereafter taken to the Huntsville city jail where he was booked for driving while intoxicated and again asked to take an alcohol breath analysis test; again appellant refused to do so until he talked with his lawyer. Some three hours after the accident appellant's attorney arrived at the jail; after conferring with him appellant agreed to take a blood alcohol test. Officer Della-Calce agreed to take appellant and his attorney back to the Huntsville Hospital so that appellant could undergo the test but advised them "that there may be people in the emergency room lobby who wished to do harm to the [appellant]." Upon learning this, appellant's attorney stated, "Just forget it. We don't want a blood test."
Appellant testified in his own behalf and related that he and his wife had attended a housewarming party at a friend's home. During the evening he consumed two beers (possibly three) and a scotch and water. Appellant estimated that while on his way home he operated his car at a speed of "45, 50 maybe 55 miles an hour", and that he first noticed the Lee station wagon when it turned off Airport Road onto Whitesburg Drive into the inside northbound lane. Appellant stated that he was traveling in the outside northbound lane when the collision occurred. As he attempted to pass the Lee station wagon, the station wagon "suddenly veered to the right . . . right in front of me."
Appellant's wife testified that in her opinion appellant was not intoxicated at the time of the collision. Several witnesses, who were guests at the housewarming party attended by the appellant, testified that appellant's speech and mannerisms at the time he left the party did not cause them to believe that he was intoxicated.
Prior to trial appellant filed a motion in limine to prevent admission of evidence of his refusal to take a blood test to determine the alcoholic content of his blood. The motion was denied and, as permitted by Alabama statute, police officers testified that appellant refused to take either a blood test or a breath test. The prosecutor commented upon appellant's refusal in this respect in his closing argument. Appellant challenges the constitutionality of the statute, and maintains error in both the admission of the evidence and the prosecutor's comment on his refusal.

I
The statute in question is the Alabama Chemical Test for Intoxication Act.[1] Appellant says that the statute itself grants a person a right to refuse to take any of the three chemical tests (blood, breath and urine) designated in the statute, and therefore evidence of refusal should not be permitted at trial. Our examination of the act compels us to disagree with the appellant.
Appellant relies on that portion of the act which provides:
"If a person under arrest refuses upon the request of a law-enforcement officer to submit to a chemical test designated by the law-enforcement agency as provided *302 in paragraph (a) of this section, none shall be given . . . ."
Title 36, § 154(c), Code of Alabama 1940 (Recomp.1958) (Supp.1973).
While it would appear that this language creates a right of refusal, the overall statutory scheme negates any such legislative intent.
Sections 154(a) and (b) of the act adopt the theory of implied consent[2] to chemical testing of a person's blood, breath or urine to determine the alcoholic content of the person's blood. Section 154(a) states in pertinent part:
"Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given his consent [to such chemical tests] . . . ."
Section 154(b) states:
"Any person who is dead, unconscious or who is otherwise in a condition rendering him incapable of refusal, shall be deemed not to have withdrawn the consent provided by paragraph (a) of this section and the test or tests may be administered, subject to the provisions of this chapter."
Although section 154(c) does allow a person to refuse to submit to chemical testing, it also calls for the immediate suspension of the person's driving privileges within the state[3] upon the sworn statement of the arresting officer that the officer:
". . . had reasonable grounds to believe the arrested person had been driving a motor vehicle upon the public highways of this state while under the influence of intoxicating liquor and that the person had refused to submit to the test upon the request of the law-enforcement officer . . . ."
Finally, section 155(h) provides:
"If a person under arrest refuses to submit to a chemical test under the provisions of this chapter, evidence of refusal shall be admissible in any civil or criminal action or proceedings arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle upon the public highways of this state while under the influence of intoxicating liquor."
When the legislative scheme is considered as a whole, it is clear that section 154(c) does not grant an accused person the "right" to refuse to submit to chemical testing. Construing section 154(c) to grant such a right would be inconsistent with the implied consent theory of sections 154(a) and (b), see State v. Tabisz, 129 N.J.Super. 80, 322 A.2d 453 (1974); with section 154(c)'s provision for automatic suspension of the accused's driving privilege, State v. Miller, 257 S.C. 213, 185 S.E.2d 359 (1971); and with allowing evidence of the person's refusal to be tested to be admitted into evidence. Instead, we agree with the concurring opinion of Judge Jasen in People v. Paddock, 29 N.Y.2d 504, 323 N.Y.S.2d 976, 272 N.E.2d 486 (1971), that:
". . . this `right' of refusal is not really a right in the sense of a fundamental personal privilege, but, rather, was merely an accommodation to avoid a distasteful struggle to forcibly take blood."
Accord Campbell v. Superior Court, 106 Ariz. 542, 479 P.2d 685 (1971); Bush v. Bright, 264 Cal.App.2d 788, 71 Cal.Rptr. 123 (1968).

II
Appellant next maintains that the admission into evidence of his refusal to take a blood test violates both the federal and state guarantees against self-incrimination. This is a question of first impression in Alabama.
The Fifth Amendment of the United States Constitution guarantees defendants a right against self-incrimination as follows:
"No person . . . shall be compelled in any criminal case to be a witness *303 against himself . . . ." (Emphasis supplied.)[4]
The Alabama Constitution of 1901 likewise grants the same right in Article I, section 6:
"That in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself . . . ." (Emphasis supplied.)
The first question which confronts us is whether the scope of the state right, which phrases the privilege in terms of a person's being compelled to give evidence against himself, is the same as the federal right, which protects a person from being a witness against himself.
Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), is the controlling decision as to the Fifth Amendment privilege. There the court held that the privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." 384 U.S. at 761, 86 S.Ct. at 1830, 16 L.Ed.2d at 914 (emphasis ours). Expounding on its holding, the Court stated:
"It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications . . . . On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling `communications' or `testimony' but that compulsion which makes a suspect or accused the source of `real or physical evidence' does not violate it." 384 U.S. at 763-64, 86 S.Ct. at 1832, 16 L.Ed.2d at 916. (footnote omitted).
In contrast, Alabama courts, construing the state constitutional prohibition literally, at first did not make a distinction between testimonial evidence and physical evidence. Any evidence forced from a defendant violated the privilege. In Cooper v. State, 86 Ala. 610, 6 So. 110 (1889), the Supreme Court held a defendant could not be compelled to make a footprint, since it was "unlawful to force the witness to give (or make) evidence against himself." 86 Ala. at 612, 6 So. at 111. In Davis v. State, 131 Ala. 10, 31 So. 569, 571 (1902), the same court said that "to conserve the spirit and purpose of the guaranty [of the state constitutional provision] the accused cannot, directly or indirectly, be compelled to do an affirmative act, or to affirmatively say anything which may tend to criminate him." There the defendant had "declined to consent" to having his shoes removed so that they could be compared with certain footprints. Evidence of the defendant's refusal was held to violate the privilege.[5] Dicta in Dean v. State, 240 Ala. 8, 197 So. 53 (1940), even indicated that to require a defendant, charged with arson with intent to defraud an insurer, to produce the insurance policy would violate the defendant's constitutional right to remain silent.
Perhaps out of dissatisfaction with the results of applying the privilege to physical evidence, although stating the rule the Supreme Court would often find the defendant had voluntarily provided the physical evidence and thus waived the protection of the privilege. In Myhand v. State, 259 Ala. 415, 66 So.2d 544 (1953), clothing worn by the defendant, who was charged with rape, *304 at the time of the crime and the test results of smears taken from the defendant's penis were held admissible because the defendant had voluntarily given his clothing to police and had not been forced to submit to the tests. In Aaron v. State, 271 Ala. 70, 122 So.2d 360 (1960), photographs of the defendant taken within a few hours of the crime (rape) were held admissible on the theory that the defendant had not objected to being photographed. The court divided on the question of whether the defendant had been forced to speak certain words which enabled the prosecutrix to identify him; the majority decided there had been no compulsion and upheld the admission of that evidence.
Although a defendant could not be required against his will to do a positive act which would produce evidence against himself, it was also held that:
". . . it does not violate this rule for another person to do an act against the will of the defendant which relates to his person, and thereby cause to be revealed matter material as evidence against him, as by an illegal search where he was `required to produce nothing, to testify to nothing, and no presumption was indulged against him as a penalty for his failure to comply with any order of court.'" Hunt v. State, 248 Ala. 217, 225, 27 So.2d 186, 193 (1946).
This rule was applied in Myhand v. State, supra, as an alternate theory for admitting the test results of the smears, and in Aaron v. State, supra, in upholding the admissibility of clothing taken from the defendant.
A dramatic change occurred upon the second rehearing of Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968). The Supreme Court reviewed its past decisions regarding physical evidence and the violation of the state privilege against self-incrimination and adopted the holding of Schmerber v. California, supra. Rejecting the distinction between forcing a defendant to provide the evidence himself and allowing others to forcibly take the evidence from him as an unsound proposition, the court held that clothing and hairs taken from the defendant were "real" or "physical" evidence rather than "evidence of a testimonial or communicative nature," and thus the privilege had not been violated.
"The act of defendant in taking off the clothes and surrendering them to the sheriff was not a testimonial or communicative act. The clothing was the witness, not the defendant." 283 Ala. at 194, 215 So.2d at 272.
Following Hubbard, this court has upheld the admission of hair taken from various parts of a defendant's body, McDade v. State, 49 Ala.App. 533, 274 So.2d 89, cert. denied 290 Ala. 369, 274 So.2d 93 (1972), cert. denied 414 U.S. 872, 94 S.Ct. 99, 38 L.Ed.2d 90 (1973); and test results of a urine sample, Russell v. State, 54 Ala.App. 452, 309 So.2d 489 (1974), cert. denied 293 Ala. 773, 309 So.2d 495 (1975). Thus, we conclude that an interpretation of Schmerber controls both the federal and state constitutional questions in this case.
The Supreme Court expressly declined in Schmerber to decide the question we now face. There the petitioner had refused a police request that he take a breath test for alcohol content. Evidence of his refusal was admitted at trial without objection. In a footnote, the Court rejected his contention that testimony regarding his refusal to take the test and a comment by the prosecutor in closing argument upon his refusal was ground for reversal under Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and stated that "general Fifth Amendment principles, rather than the particular holding of Griffin, would be applicable in these circumstances," citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Schmerber v. California, supra, n. 9. However, since the petitioner failed to object to introduction of the evidence, the Court did not reach the question.
We return, then, to the general Fifth Amendment principles of Schmerber and Miranda. The Court summarized its discussion of the Fifth Amendment privilege in Miranda v. Arizona by saying:

*305 "We have recently noted that the privilege against self-incriminationthe essential mainstay of our adversary systemis founded on a complex of values. All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a governmentstate or federalmust accord to the dignity and integrity of its citizens. To maintain a `fair state-individual balance,' to require the government `to shoulder the entire load,' to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. In sum, the privilege is fulfilled only when the person is guaranteed the right `to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" 384 U.S. at 460, 86 S.Ct. at 1620, 16 L.Ed.2d at 715 (citations omitted).
The Court reaffirmed this statement in Schmerber by distinguishing the compulsion of communications or testimony and the compulsion of physical evidence. See quotation, supra. The question, then, is whether a defendant's refusal to take a chemical analysis test is a communicative act involving that person's testimonial capacities, or is merely circumstantial, real evidence which does not fall within the privilege.
In the same footnote already discussed, the Court in Schmerber recognized that an accused, faced with having to take a chemical test, may incriminate himself. The Court commented:
"Such incriminating evidence may be an unavoidable by-product of the compulsion to take the test, especially for an individual who fears the extraction or opposes it on religious grounds. If it wishes to compel persons to submit to such attempts to discover evidence, the State may have to forego the advantage of any testimonial products of administering the testproducts which would fall within the privilege. Indeed, there may be circumstances in which the pain, danger, or severity of an operation would almost inevitably cause a person to prefer confession to undergoing the `search,' and nothing we say today should be taken as establishing the permissibility of compulsion in that case." 384 U.S. at 765, 86 S.Ct. at 1833, 16 L.Ed.2d at 916.
Precisely what sort of communications, either words or actions, by an accused the Court had in mind is not apparent. In a separate paragraph the Court characterized an accused's refusal to take a chemical test as a "similar issue." Thus it is unclear whether that Court considered such a refusal to be an entirely different class of evidence from incriminating evidence which is "an unavoidable by-product of the compulsion to take the test," or whether the Court thought there might be circumstances in which a person's refusal would fall within the ambit of the privilege. Schmerber, then, offers no compelling answer to our question.
A minority of the jurisdictions which have considered the question have held that evidence of an accused's refusal to submit to chemical testing violates the privilege against self-incrimination. The rationale for such a conclusion is best stated in Constitutional Limitations on the Taking of Body Evidence, 78 Yale L.J. 1074, 1084 (1969):
"Evidence of a suspect's refusal, whether expressed orally or by physical resistance, is relevant to the crime charged only in its testimonial aspect, as the approximate equivalent of the statement, `Because I fear that the examination will produce evidence of my guilt, I refuse to permit it.' Therefore, the privilege against self-incrimination seems relevant."
The author reaches this conclusion on the basis of the footnote in Schmerber, arguing that the reference to Miranda means that evidence of any refusal to cooperate is inadmissible because it is a tacit admission of guilt.
*306 Furthermore, it is argued, such testimonial evidence would seem to be compelled from the accused by the state:
"In one sense the testimonial action is obviously not compelledthe state is not ordering the suspect to refuse cooperation. But the state does compel a suspect to choose between submitting to a perhaps unpleasant examination and producing testimonial evidence against himself. The suspect's option to submit to a lawfully imposed burden instead of implicitly testifying against himself does not necessarily save the procedure: lifting a lawful burdenthe examinationis in effect an inducement that casts doubt on the `voluntariness' of the testimonial evidence thereby obtained." 78 Yale L.J., at 1084 (Emphasis in original).
The idea that a suspect is put to a choice is based on the assumption the suspect was informed that if he refused to submit to testing his refusal would be offered against him. It is also necessary that the state use only the evidentiary penalty.
The Supreme Court of Minnesota quoted this law journal note in reaffirming its pre-Schmerber decisions that evidence of an accused's refusal to be chemically tested violates the privilege against self-incrimination. State v. Andrews, 297 Minn. 260, 212 N.W.2d 863 (1973), cert. denied 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974). The leading pre-Schmerber decision, State v. McCarthy, 259 Minn. 24, 104 N.W.2d 673 (1960), was based upon the state constitutional provision against self-incrimination and the state chemical testing statute making such testing voluntary on the defendant's part. Although it appears that State v. Andrews, holding that Schmerber left State v. McCarthy undisturbed, involved the Fifth Amendment as well, the United States Supreme Court denied certiorari on the grounds that Andrews was based on adequate state grounds.
In People v. Rodriguez, 80 Misc.2d 1060, 364 N.Y.S.2d 786 (1975), the Supreme Court of Bronx County, Trial Term, held that a refusal to take chemical tests is by definition a communication and thus is protected by the Fifth Amendment. This decision was followed in People v. Johnson, 88 Misc.2d 53, 387 N.Y.S.2d 801 (1976, Criminal Court of the City of New York, Bronx County, Jury Part I).
In Johnson v. State, 125 Ga.App. 607, 188 S.E.2d 416 (1972), the Court of Appeals of Georgia held evidence of refusal to submit to chemical testing violative of the privilege on the basis of Gay v. City of Orlando, infra, and Griffin v. California. This decision was reaffirmed in Westbrooks v. State, 135 Ga.App. 807, 218 S.E.2d 908 (1975), and Rowell v. State, 128 Ga.App. 138,195 S.E.2d 790 (1973).
In Gay v. City of Orlando, Fla.App., 202 So.2d 896 (1967), cert. denied 390 U.S. 956, 88 S.Ct. 1052, 19 L.Ed.2d 1149 (1968), the defendant was told he had a right not to take a breath analysis test and he refused to do so. The court held that evidence of the defendant's refusal to submit to the test was a "testimonial by-product" protected by the privilege. This decision was subsequently interpreted by a different appellate court to have been decided on due process grounds, since the defendant had been informed he had a right to refuse. State v. Esperti, Fla.App., 220 So.2d 416 (1969). The Supreme Court of Florida has not yet resolved the conflict between these two decisions.
The majority of the jurisdictions hold that evidence of refusal to submit to chemical testing does not violate the privilege against self-incrimination. One rationale is that, since under Schmerber v. California the taking of bodily evidence does not violate the privilege, evidence of refusal to give bodily evidence does not violate the privilege. Alldredge v. State, 239 Ind. 256, 156 N.E.2d 888 (1959); State v. Holt, 261 Iowa 1089, 156 N.W.2d 884 (1968); State v. Dugas, 252 La. 345, 211 So.2d 285 (1968); City of Westerville v. Cunningham, 15 Ohio St.2d 121, 239 N.E.2d 40 (1968). However, this approach ignores the nature of evidence of refusal and was specifically discredited in the Schmerber footnote.
The better view, and the one which we now adopt, is that expressed in People v. *307 Ellis, 65 Cal.2d 529, 55 Cal.Rptr. 385, 421 P.2d 393 (1966). Although the precise question there was whether refusal to participate in a voice identification test violated the privilege, the same rationale was applied to refusal to take a breath analysis test in People v. Sudduth, 65 Cal.2d 543, 55 Cal.Rptr. 393, 421 P.2d 401 (1966), decided the same day as Ellis. The court characterized the defendant's refusal to "display his voice," not as a testimonial communication, but rather as:
". . . circumstantial evidence of consciousness of guilt, and like similar evidence, such as escape from custody, false alibi, flight, suppression of evidence, and failure to respond to accusatory statements when not in police custody, its admission does not violate the privilege. Moreover, as in the foregoing examples, the evidence did not result from a situation contrived to produce conduct indicative of guilt. . . . [T]he purpose of asking defendant to speak was to obtain probative physical evidence and the conduct was merely incident to that effort. A guilty party may prefer not to find himself in a situation where consciousness of guilt may be inferred from his conduct, but it can scarcely be contended that the police, who seek evidence from the test itself, will tend to coerce parties into refusing to take tests in order to produce this evidence.
". . . [G]uilty conduct is not a testimonial statement of guilt. It is therefore not protected by the Fifth Amendment. By acting like a guilty person, a man does not testify to his guilt but merely exposes himself to the drawing of inferences from circumstantial evidence of his state of mind." 55 Cal.Rptr. at 389-90, 421 P.2d at 397-98.
Dealing with the footnote in Schmerber, the court said:
"We do not believe . . . that the inferences flowing from guilty conduct are . . . testimonial products. Rather, the court's concern seemed directed to insuring full protection of the testimonial privilege from even unintended coercive pressures. In the case of a blood test, for example, the court considered the possibility that fear induced by the prospect of having the test administered might itself provide a coercive device to elicit incriminating statements. Such a compelled testimonial product would of course be inadmissible." 55 Cal. Rptr. at 390, 421 P.2d at 398.
The rationale of People v. Ellis has been followed by other courts holding evidence of refusal to submit to chemical analysis tests does not violate the privilege against self-incrimination. Campbell v. Superior Court, supra; State v. Durrant, Del., 188 A.2d 526 (1963); State v. Bock, 80 Idaho 296, 328 P.2d 1065 (1958); State v. Smith, 230 S.C. 164, 94 S.E.2d 886 (1956). We note that Judge Cates in his concurring opinion to Coleman v. State, 44 Ala.App. 429, 211 So.2d 917, cert. denied 282 Ala. 725, 211 So.2d 927 (1968), vacated 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), adopted the above quoted portion of People v. Ellis.
We hold that evidence of an accused's refusal to take a chemical analysis test violates neither the federal or state privilege against self-incrimination. Section 32-5-193(h), Code of Alabama 1975 and its predecessor title 36, section 155(h), Code of Alabama 1940 (Recomp.1958) (Supp.1973), are constitutionally sound.

III
Appellant also contends that evidence of his refusal to take a blood test violates basic principles of due process because such evidence is not probative on the issue of his intoxication and is highly prejudicial.
At least one court has held that evidence of a defendant's refusal to submit to chemical testing was not probative on the question of the defendant's intoxication and served only to prejudice the jury. People v. Knutson, 17 Ill.App.2d 251, 149 N.E.2d 461 (1958). However, that court considered the chemical tests themselves to be inaccurate and also concluded that test results would be inadmissible.
*308 Recently a study was made of case records of 281 DWI offenders to determine if refusal to submit to chemical testing for blood alcohol content can be assumed to reflect consciousness of guilt and a desire to conceal incriminating evidence. M. Argeriou, Refusal to Take Breathalyzer Test Rebutting Adverse Presumption, 11 Crim.L. Bull. 350 (1975). The researcher concluded that presently there appears to be "little support for the assumption that individuals who refused the breathalyzer test did so as a result of a heightened `consciousness of guilt' and a conscious desire to avoid providing additional and specific chemical evidence of their level of intoxication," and that evidence of refusal should not be used against an offender. However, no alternative reasons for refusal are postulated and the author admits that his conclusions cannot be generalized until further studies, using a larger and more geographically diverse sample, are made.
We think the current prevailing view, that testimony concerning a defendant's refusal to submit to chemical testing is competent circumstantial evidence, is sound. People v. Suddeth, supra; State v. Meints, 189 Neb. 264, 202 N.W.2d 202 (1972); City of Esterville v. Cunningham, supra. Thus, we find no merit to appellant's due process contention.

IV
Appellant's next contention is that Section 155(h), supra, whether or not constitutional, was unconstitutionally applied to him in the instant case. Therefore evidence of his refusal to be tested was erroneously admitted at trial. This argument is grounded first on allegations that: (1) the appellant was not properly advised that the refusal to take the chemical tests could result in a ninety (90) day suspension of his license under Section 154(a), and (2) police officers did not designate an alternative test to the blood test as set out in Section 154(a).
Both allegations are without substantial factual basis in the record. Officer Hammonds testified that he informed appellant of both blood and breath tests and warned appellant of the license removal consequence of his refusal to submit to the blood test. (R. 636). Officer Della-Calce testified as well that he gave appellant a choice of blood or breath tests and advised appellant that failure to allow the tests could result in a license suspension of at least 45 days (R. 801) (Title 36, Section 154(c), Code of Alabama 1940.) We find no merit in this argument of appellant.
Appellant contends secondly that 155(a) was improperly applied because the State failed to lay a predicate showing that, had appellant submitted to the tests, any chemical test results admitted in court would have been obtained from tests properly administered under Section 155(b). We need only point out that we view Section 155(b) to apply to the admission of the results of chemical analysis as evidence, not to the admission of the refusal to submit to those tests. See Patton v. City of Decatur, Ala.Cr.App., 337 So.2d 321 (1976). Hence, the statutory requirement that the State must lay a proper predicate for introduction of evidence of chemical analysis results is not before this Court under the facts of this case.
Appellant's final contention in this area is that his refusal to be tested was unconstitutionally coerced, and that evidence of prior conditional refusals and the final coerced refusal were erroneously admitted at trial.
The appellant seems to contend primarily that he had the right to consult an attorney or physician prior to consenting to take one of the chemical tests. He argues his refusal to submit to testing before he consulted his attorney was merely a conditional refusal which he had the legal right to make prior to receiving the advice of counsel. As such, evidence of the conditional refusal was inadmissible at trial. As we stated in I above, however, the appellant had no right whatsoever to refuse to take the chemical test. Thus he had no such attending constitutional or statutory right to consult with an attorney or physician before agreeing or *309 refusing to submit to the chemical test. This is clearly to be distinguished from any constitutional prohibition forbidding a prosecutor to use at trial evidence of a suspect's assertion of an established constitutional right or privilege against self incrimination, such as that enunciated in Miranda v. Arizona, supra. See, Schmerber v. California, supra (Footnote 9).
Appellant points out additionally that he was told by Officer Hammonds that "you have your right to have anyone you want here to talk to you before you submit to this." Appellant asserts that he should have been able to rely on the officer's assertion that such a right existed. Yet, every person is presumed to know the law; ignorance of the law is no defense. Weeks v. State, 24 Ala.App. 198, 132 So. 870, cert. den. 222 Ala. 442, 132 So. 871 (1931). ". . . [N]o amount of assurance, even from those learned in the law, of the existence of rights in the premises, which in point of fact do not exist, can justify or excuse an act . . . . The giving of such assurance or advice neither increases nor diminishes criminality in any degree. . . ." Barnett v. State, 89 Ala. 165, 7 So. 414 (1890); Reed v. State, 248 Ala. 196, 27 So.2d 25 (1946). Officer Hammonds had no power by his bare assertion to create such a right under the law. Considering further that Officer Hammonds later told appellant "Myself, personally, if you don't want to sign the form now I am personally taking it as a refusal . . ." and the fact that appellant, on advice of counsel, ultimately did refuse the test, we see no merit in this argument.
Appellant argues secondarily that his ultimate refusal to be tested after consulting with his attorney was induced by fear of physical harm from angry bystanders at the emergency room. Hence, his refusal would be a coerced self-incriminatory statement, inadmissible as indicating a consciousness of guilt.
The record indicates the following exchange between Officer Della-Calce and the prosecutor (R. 805-807):
"Q You did have a conversation with the attorney there?
"A Yes, I did.
"Q What did you say to the attorney?
"A I advised him that we already had asked him on numerous occasionsasked Hill on numerous occasions if he wished to take a blood test. Mr. Hill refused. And at this time the attorney said he wanted to take the blood test at this time. I advised him that it had been three hours after the accident. He advised that the attorney said that asked if I was refusing to have one, a blood test, for his client. I advised him no, that if he wished we could take him to the hospital and get a blood test, but we would stipulate that it had been three hours after the time of the accident."
* * * * * *
"Q All right. After having a conversation, or there was some conversation had there, what did you do next?
"A I again took the subject down to the first floor, down to the basement, with his attorney, who was going to ride to the hospital with us.
"Q What transpired, what conversation took place, what happened?
"A I was advising the Defendant as to what we would do once we reached the emergency room. I told him I would call another unit to assist us there, and I advised him that I would not handcuff him. At this time the attorney asked why, and I advised that there may be people in the emergency room lobby who wished to do harm to the Defendant. He said at this time, `Just forget it. We don't want a blood test.' I took the Defendant back up to the third floor.
"Q You had been in the emergency room of Huntsville Hospital, hadn't you?
"A Yes."
Officer Della-Calce testified again as follows in answer to Mr. Berry's question (R. 962):
"Q Did you tell Larry Hill that when he got down there to the Emergency Room that he had your permission to run?

*310 "A I did not tell him he had my permission to run, no, sir. I did advise him if there was any trouble that I would wish for him to get away, yes, sir."
While on first blush it may appear that the appellant's final decision to refuse the test was made under circumstances less than free from pressure, a close examination of the record reveals no concrete evidence of improper pressure on the appellant while reaching his decision.
There is no evidence, other than Della-Calce's statement, that appellant's life or health would have been endangered at the hospital. Nor was there evidence that any possible disturbance could not have been reasonably controlled such as to insure the appellant's safety. In addition, if appellant had seriously desired to be tested, he could have simply requested that he be taken elsewhere for testing or that medical personnel be brought to the jail to administer the test. We find no factual basis in the record of any extraordinary circumstances existing that night which precluded the appellant's receiving the test, other than his own conscious refusal to do so. Hence, the argument is without merit.

V
Johnny Ray Bailey, an ambulance driver, for Emergency Medical Services, assisted at the scene of the wreck. On cross-examination by Mr. Berry, he was asked if he had received any written or transcribed oral statement, notes and/or records before coming to the Court to testify. The record reflects the following exchange (R. 502, 509-513):
"Q Have you discussed with anyone what your testimony was going to be here today?
"A The only thing I did was re-read the statement I made just after the accident happened. They called me for a statement. That's the only thing I did.
"Q Who called you for a statement?
"A The District Attorney's office, back shortly after the accident.
"Q And who gave you that statement to re-read?
"A I don't know his name. His first name is Ken.
"Q When did you read it?
"A I came over this morning. I came early.
"Q Would you get that statement and let's look at it together, please?
"MR. BERRY: We would ask the District Attorney's office to produce the statement that he has used for the purpose of reviewing and refreshing his recollection. He just testified that he read the statement that he gave to the District Attorney's office before he got on the witness stand. We would like to have that statement for the purpose of cross-examination, Your Honor.
"THE COURT: You first said you wanted it for purposes of refreshing his recollection.
"MR. BERRY: No, sir. We would like it for the purpose of cross-examination and testing his recollection."
After further cross-examination the following occurred:
"MR. BERRY: Judge, again at this time we move The Court respectfully to have the District Attorney's office produce not only the tape recording that was made, but also this paper that someone else typed and handed to him for the purpose of, at least in part, refreshing his recollection, so we can use it for cross-examination purposes.
"MR. SIMPSON: If it please The Court, the only tape recording that we used
"MR. BERRY: We object to any such statement on his part, except just an objection.
"THE COURT: Do you object?
"MR. SIMPSON: Yes, sir, I do object.
"THE COURT: Sustained."
* * * * * *
"MR. SIMPSON: If there is any misunderstanding, I want to introduce this as an exhibit; but I am saying that the only tape recording we have is a Grand Jury tape recording. I have no others."
* * * * * *

*311 "MR. BERRY: Judge, I have no objection to the statement that the District Attorney and his staff prepared coming in, if they will also put into evidence the tape recording that they transcribed it from, so that we can see that it is accurate.
"MR. SIMPSON: You can see that it is not transcribed. It is an investigative report.
"THE COURT: Let me rule on it, Mr. Berry. I think it would be appropriate to say that it is inappropriate that you authorizeThat you agree to let something come in conditioned on something else. In other words, you are saying that you agree that it will come in, if he does so and so. The point is this: I can only rule on whether it comes in or not. Now, he has offered it. Now then, if you object to it you must so state and I will rule on it.
"MR. BERRY: We respectfully take exception to The Court's statement to Counsel to that effect in the presence of the Jury.
"THE COURT: To what effect?
"MR. BERRY: The statement you just made, Your Honor, and I say that with all due respect.
"THE COURT: Well, I understand that.
"MR. SIMPSON: If it please The Court, I have on numerous occasions asked to let the Jury go out, but
"THE COURT: I am not concerned about that. I am simply saying that the same rule applies to Counsel for both sides. It's not just a one way rule. The rules that we operate under are for both sides. I will say this, that both of you have Both of you have said, "I will let this in if he will let so and so in." You don't let it in. The Court lets it in. The Judge rules on whether it goes in or not, according to the rules of evidence. Sometimes if it gets twisted and somebody doesn't understand I want to make sure that the record reflects it correctly, what is done. I am called on to rule on whether or not this comes inNo, I am not called on. You have offered it. Mr. Berry has asked for it and you have objected to giving it to him and I have sustained. Now, you have offered it as an exhibit, and Mr. Berry states he will let it in if you will put the tape recording in. My statement is that evidence doesn't come in on the basis of a condition of some other, whether it is from the State or from the Defendant.
"Now, that has been offered.
"MR. SIMPSON: Now, the State wants to offer, as soon as I can mark itJust a minute.
"Would you mark this?
"THE COURT: I think it's inappropriate because the Defense Counsel has this witness on cross-examination.
"MR. SIMPSON: I just want to have something to refer to.
"THE COURT: Go ahead and mark it. Mark it as a State's exhibit.
"MR. SIMPSON: The State has no objection to entering into evidence State's Exhibit Number 13.
"MR. BERRY: We object to any further statement from Mr. Simpson in the presence of the Jury to this effect. It is prejudicial and we object to it.
"THE COURT: Well, I will overrule and I overrule his offer of it. It is not appropriate to offer it at this time because you are cross-examining this witness. However, he has offered it and you have objected and I have sustained.
"All right. Are you read [sic] to proceed?"
While the record is somewhat confusing, it is apparent that whatever statement was used by Mr. Bailey to refresh his recollection was referred to by Mr. Bailey before he took the stand in Court. Appellant's motion to see that statement was denied, and properly so. The law does require the Court to allow counsel to see and examine a report used by a witness on the stand to refresh his memory. Here, however, as in Henry v. State, 46 Ala.App. 175, 239 So.2d 318 (1970), there is no indication that the witness ever had the statement in the courtroom. We, as the Court in Henry, decline ". . . to extend the above rule to include the production of reports *312 or memoranda, etc., reviewed before coming to Court to refresh the witnesses recollection . . . ." The Court below did not err in its refusal to allow appellant to view this statement. See also, Robinson v. State (1973), 49 Ala.App. 511, 273 So.2d 487.

VI
Appellant argues that a letter sent by the District Attorney's office to certain witnesses prior to trial had such an intimidating effect upon those witnesses as to deprive him of access to their voluntary cooperation in obtaining pretrial statements from them. The contents of the letter are as follows (R. 1513):
"It is the duty of the District Attorney to represent the people of the State of Alabama in the prosecution of Lawrence G. Hill who has been charged and indicted by your Grand Jury with first degree murder in the homicide of Mark Pizitz.
"Mark Pizitz did not simply die an unfortunate death in an automobile accident. It has been found by your Grand Jury that Mark Pizitz was killed by a person traveling at a high rate of speed on the highways of Madison County while under the influence of an intoxicating beverage, i. e., a drunken driver.
"I am not attempting by this letter to set out the facts of this case. That is a matter that should be handled under the direction of the court and in full public view in the courtroom in Madison County.
"Mr. Hill's attorneys may have written you a letter concerning their representation of this defendant. The letter forwarded by these attorneys is misleading and misguided in my opinion. The attorneys have mis-stated the facts and also mis-stated the law. You should disregard the letter and not be intimidated by its content.
"This office respects your privacy and while we may wish to talk to your child at a later date concerning the facts of this homicide, we hasten to inform you that he cannot be compelled to discuss this case with our office or anyone else.
"Certainly, it is not necessary for your child to give a statement to Mr. Hill's attorneys if you do not desire for him to do so. One purpose of taking these statements is that when a person appears at the trial, the attorneys use prior statements that have been made by the witness to contradict statements made at trial. If you or your child wish to talk to Mr. Hill's attorneys, please feel free to do so but it is not required by any law or the court.
"If I might be of help in this matter or any other matter, please feel free to call at anytime. Until then, I remain
 Your obedient servant,
 Fred B. Simpson
 District Attorney"
Certainly the prosecutor may not prevent a witness from giving a statement to the defense attorney. Any defendant has the right to attempt to question any witness prior to trial he so desires in the absence of intimidating influence. However, by the same token, any witness has an attending right to refuse to be so interviewed. Golson v. State, 34 Ala.App. 396, 40 So.2d 725 (1949) and cases cited therein; see also Veith v. State, 48 Ala.App. 688, 267 So.2d 480 (1972) and cases cited therein. While the letter quoted above is neither totally unbiased, nor totally accurate in its representations of the grand jury process, it is not grounds for reversal. The general purpose of the letter is merely an explanation to the witnesses of those very rights we have set forth above. We find no stated or implied intimidating effect which requires reversal. Also, the law assumes the defense counsel will act with due diligence to have necessary witnesses present at trial. By use of compulsory process requiring attendance of such witnesses, the defendant is assured of a proper presentation of his case at trial. Additionally, a searching cross-examination is also the right of the defendant. Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666 (1972); Veith, supra. Our review of this lengthy trial record convinces us that the defense did in fact thoroughly and diligently cross-examine witnesses at trial, and *313 hence we find no prejudicial effect on appellant's right to properly prepare and present his defense.

VII
Appellant contends the Court erred by refusing to permit appellant to play a tape recording before the jury proffered to refresh the recollection and show prior contradictory statements of a State's witness.
The question was presented to the Court below as follows (R. 188):
"MR. BERRY: Your Honor, we would like permission of The Court to play to this witness the tape recording that he acknowledges having previously made with Mr. Charles Edgar, on January 15, 1976.
"MR. SIMPSON: If it please The Court, the State objects.
"THE COURT: Sustained.
"MR. BERRY: We except.
"Q Mr. Branson, if you heard your voice on the tape recording do you think it would be beneficial to refresh your recollection as to what you told Mr. Edgar on January 15, 1976?
"MR. SIMPSON: The State objects to that question.
"THE COURT: Sustained."
* * * * * *
"Q Mr. Branson, if I hand you a typewritten transcript of that conversation that you and Mr. Edgar had on January 15, 1976, do you think you would be able to review it and look at it and recognize it?
"A I guess so.
"MR. SIMPSON: If it please The Court, if this document is going to be shown to this witness we would like the entire document to be marked and the State would offer the entire document into evidence.
"MR. BERRY: Fine. We agree to that.
"THE COURT: I think it's getting about time to quit now.
"MR. BERRY: That's fine with us, Judge.
"We offer Defendant's Exhibit 11."
It would have been improper to have played the tape before the jury without the Court first having had the opportunity to screen out irrelevant or hearsay evidence possibly contained therein. Kissic v. State, 266 Ala. 71, 94 So.2d 202 (1957). Further, a transcript of the tape was offered into evidence without objection and was available for impeachment purposes. We find no error in the Court's ruling. Turner v. State, 45 Ala.App. 419, 231 So.2d 341 (1969).

VIII
Appellant argues the trial court erroneously restricted his cross-examination so as to exclude evidence of a pending wrongful death action against the appellant which arose from the same facts as the instant case.
The record reflects the following exchange between the Court and the attorneys (R. 311):
"MR. SIMPSON: . . . . However, the State does make a motion to The Court to instruct Counsel to not intentionally or knowingly bring up the subject, or ask any questions, or to do anything, to extract information from witnesses concerning a civil suit, that is, to disallow any reference in this criminal trial to any civil suit concerning the same similar facts.
"THE COURT: I am going to grant the motion. I understand that you will have a motion outside the presence of the Jury to introduce possibly into evidence the civil complaint, and this doesn't cover this at this time.
"MR. BERRY: We except to The Court's ruling. As grounds of our exception, we respectfully call to The Court's attention the fact that the very last witness that was on the stand, Mr. Gunter I believe, and possibly the present witness, Deborah Moore, the State's attorney on direct examination elicited from at least one of those witnesses testimony and statements to the effect that they had given statements in a pending civil suit. Maybe the response was not made in direct response to a question that called for that particular *314 answer, however, the response was made by the witness, nonetheless, and it thereby became incumbent upon the State, if the answer was not responsive, to move that the unresponsive answer be excluded so that it would not be considered as evidence in this case. We contend that the State having opened that door, either intentionally or unintentionally, and left it open that we are now entitled to walk through it."
* * * * * *
"THE COURT: The Court understood the last witness to answer a question concerning the number of statements that she had made, that she made in addition to other statements, that she had made statements to both insurance companies. Now, I am of the opinion that there has been no abuse, or certainly no intentional questions on anybody's part concerning a civil action, and I think it would be appropriate that there not be; however, since there has been something concerning the possibility of a civil action, I believe that Counsel will, and I would expect them to, preserve the integrity with which they are charged, not to go into it in detail, while, at the same time, if on examination it comes out and the other party wants to pursue it for clarification I would have to say that it would be appropriate. I am of the opinion that it is not material to this case and I don't think it would add anything to it and would only detract from it. So that's the position of The Court in the matter."
Evidence, to be competent and admissible, must be relevant. That is to say, evidence must tend to prove or disprove the issues before the jury. Slagle v. State, 39 Ala.App. 691,108 So.2d 180 (1959). The determination of the relevancy or lack of relevancy of particular evidence rests largely in the sound discretion of the trial judge. Bryant v. State, 49 Ala.App. 359, 272 So.2d 286 (1974), cert. denied 289 Ala. 740, 272 So.2d 297 (1973), cert. denied, 412 U.S. 922, 93 S.Ct. 2744, 37 L.Ed.2d 149 (1972). It is, therefore, the duty of the trial judge to limit evidence to the points in issue so that the attention of the jury is not distracted, nor withdrawn from the primary issues, to be directed towards foreign matters or issues of questionable or doubtful relevancy. Jones v. State, 17 Ala.App. 394, 85 So. 830 (1920); Hoomes v. State, 34 Ala.App. 121, 37 So.2d 686 (1948).
The Court below found that neither attorney had purposefully brought in evidence of the pending civil suit. To remove all doubt, however, he later instructed the jury as follows:
"THE COURT: I simply rule that there has been testimonyI don't know whether it has been from the State or from the Defendant, but there has been testimony concerning the fact of a civil action. I say to you, Ladies and Gentlemen, that any evidence pertaining to a civil action you are not to consider, as far as the trial of this case is concerned, or to the ultimate conclusion that you have to reach in it. I do not say to you that testimony from witnesses concerning whether or not they have made statements about the civil action or not, that you shouldn't consider it, but anything about the civil action as such you should not consider."
Further, the Court found that evidence of such suit was not relevant to the resolution of those issues before the jury, and thus decided not to allow it. We find no abuse of the Court's discretion in these rulings. Criminal and civil suits, even though they involve the same matters, are not, by their very nature, probative one of the other. A defendant may be civilly, yet not criminally liable. Two such cases lack a mutuality of the parties. And, finally, the purpose of the proceedings and the proceedings themselves are totally different in criminal and civil suits. See, Wall v. State, 2 Ala.App. 157, 56 So. 57 (1911). Appellant's cross-examination was properly restricted on this matter. Cf. Malone v. State, Ala.Cr.App., 358 So.2d 490 (1978).

IX
Citing Thomas v. State, 18 Ala. App. 268, 90 So. 878, appellant alleges the trial court erred by allowing the district *315 attorney to argue matter in his closing argument which had been excluded from consideration by the judge earlier in the trial. The record reveals this exchange (R. 613):
"Q Did you observe anything inside the automobile when you got into it to put it in neutral?
"A Well, whenever I opened the door the vehicle kind of smelled like a brewery and there was a
"MR. BERRY: We object to that and move to exclude it.
"THE COURT: Sustained. Disregard the answer, Ladies and Gentlemen."
During closing argument by the prosecutor the following occurred (R. 1433):
"MR. MORGAN: You heard from the wrecker drivers, and they told you they had the opportunity or the occasion to go over and view the Pontiac, and Mr. O'Neal told you that it smelled like a brewery.
"MR. BERRY: We object. The Court excluded that statement. It's improper now for Counsel to argue that which The Court has excluded from consideration of the Jury.
"THE COURT: I didn't hear what
"MR. BERRY: Mr. Morgan made the extemporaneous statement that the Pontiac smelled like a brewery. That was excluded from consideration by The Court. It's now improper for Mr. Morgan to comment on it.
"MR. MORGAN: Judge, that was definitely his testimony.
"THE COURT: Well, I will overrule then. Anyway, I would overrule as to that.
"MR. BERRY: We except and we respectfully ask The Court to instruct the Jury to disregard Mr. Morgan's comments to the Jury about Mr. O'Neal having stated that the Pontiac smelled like a brewery, inasmuch as when Mr. O'Neal made that statement from the witness stand, on motion of defense counsel, the Jury was instructedThe Court instructed the Jury to disregard that statement and it was not to be considered by them as evidence in this case.
"MR. SIMPSON: The State doesn't remember it that way at all.
"THE COURT: Well, I will overrule.
"MR. BERRY: We except."
Though it is true that the statement in question above was excluded by the trial judge, the record reflects that the substance of this statement came in later in the trial without objection by the appellant (R. 613):
"Q Tell the Jury, please, what you saw in the car.
"A Well, as I opened the door there was a beer can right under the edge of the vehicle. There was a tan coat in the seat of the passenger side and a glass in the floorboard.
"Q Did you have occasion to smell any peculiar odors inside the automobile? I am talking about the Pontiac automobile.
"A You couldn't help but smell it when you opened the door.
"MR. BERRY: We object. Not responsive.
"THE COURT: Sustained. Disregard the answer, Ladies and Gentlemen.
"MR. BERRY: We ask The Court to please instruct the witness to make his answers responsive to the questions asked.
"THE COURT: Mr. O'Neal, if you will, when he asks you a question just give a direct answer. If you can't do that just say you can't.
"Q Did you smell something inside the car?
"A Yes, sir.
"Q What was that odor, if you can identify it?
"A It was an alcoholic beverage smell."
Considering that evidence both of the presence of a beer can and of the presence of the smell of an alcoholic beverage in the vehicle came in without objection, we find no error in allowing the prosecutor's argument quoted above.

X
Appellant insists that the trial Court committed reversible error by allowing the *316 prosecutor, over appellant's objection, to question a defense character witness as to his knowledge of a particular act of the defendant.
The record reflects the following exchange (R. 1323):
"Q If you had known before January 10 of this year that this Defendant had been arrested and convicted of the offense of speeding on several occasions prior to that time, would that have had any affect on your opinion as to him being a good-Having a good reputation in the community and being a law abiding person?
"MR. BERRY: We object. That question assumes facts not in evidence. The question includes an alleged arrest. Everybody well knows that you simply get a citation for speeding. It's prejudicial. It is not properly predicated.
"MR. SIMPSON: We object to Defense Counsel testifying before the Jury, unless he is going to take the oath.
"THE COURT: Overruled.
"You may answer.
"A I really can't answer that.
"Q Well, in your best judgment, would that have had any affect on your opinion?
"A Without knowing the circumstances of the arrest, I couldn't answer that.
"Q Well, just knowing the fact that he had been arrested for speeding on several occasions?
"A No, I don't think it would.
"Q It would not?
"A No."
The question was clearly answered in the negative. A negative response by a character witness to a question relating to the defendant's prior misconduct removes the possibility of any injury to the defendant. Binion v. State, 57 Ala.App. 234, 327 So.2d 729 (1976), and cases cited therein. Hence the trial Court did not err to reversal by this rulings.

XI
Appellant asserts the trial court erred in sustaining a prosecution objection to a question during appellant counsel's interrogation of a defense character witness. The question and ruling were as follows (R. 1320):
"Q Are you familiar with the reputation of Larry Hill in this community, on or before January 10, 1976, for sobriety?
"A Yes.
"MR. SIMPSON: We object to that.
"THE COURT: I sustain as to the last one, Mr. Berry."
Character is provable only by evidence of one's general reputation. This rule applies to testimony as to general reputation for a specific trait involved in the conduct in question, as well as, to general reputation as a whole. See McElroy, The Law of Evidence in Alabama, 2d ed., § 26.02(1)-(4), citations omitted. The question was in improper form, and objection thereto was properly sustained.

XII
Appellant argues the Court below erred to reversal by certain rulings he contends deprived him of his right to conduct a thorough cross-examination of prosecuting witnesses. We do not agree. The appellant cites the following rulings as error (R. 532):
"Q On January 23, 1976, were you not asked this question and did you not give this response? Question: Did you observe him as he walked, or could you describe his general appearance? Answer: Well, he was upset. You could tell he was upset about something, and he wasHe talked as if he was confused and he was real uncooperative. He didn't want anybody to bother him and he wanted to go and do it this way.
"Did you give that answer?
"MR. SIMPSON: If it please the Court, we object.
"THE COURT: Sustained.
"MR. BERRY: We except, Your Honor.
* * * * * *
"Q On January 23, 1976, did you not make this statement which was reflected on the tape recording that you just listened *317 to? Question: Did you at any time form a judgment as to whether they were intoxicated or not? Answer: No, because I didn't smell any strong odor. Like I say, I wasn't close enough to either one of them to smell anything that would convince me of it. The only thing that I had an opinion on is that Mr. Hill was very uncooperative, and I thought maybe something was wrong by that. Like Randy has said, that head injuries can cause it. Intoxication can cause the uncooperative patient. Really, not being in contact with them, I couldn't form a judgment on anything.
"MR. SIMPSON: Judge, we object to that question and answer because it does not accurately reflect, or it is not an accurate transcription of what this witness has said.
"THE COURT: I sustain the objection."
However, the record reveals the following question and answer (R. 532):
"Q You tell this jury here today that in your judgment and opinion Mr. Hill was intoxicated on that occasion. Is that what you are telling them from the witness stand, Mr. Bailey?
"A Yes, sir."
The substance of the two questions objected to came in without objection in this last quoted question. Thus, after rephrasing his question, the appellant was allowed to ask and receive an answer to a question which covered in substance the questions ruled out. Hence, we find no harmful error in the above trial Court rulings.
Appellant further cites the following rulings as erroneously restricting cross-examination (R. 956):
"Q You testified thatlet me back up. Within a few minutes after Jim Tatum arrived he made known to you that Larry Hill was agreeable to submit to the breath analysis test, didn't he?
"A To the blood test?
"Q To the breath test.
"A I do not recall.
"MR. SIMPSON: We object; argueing [sic] with the witness. The witness has answered and he said blood test and attorney is trying to put words in his mouth.
"THE COURT: Don't argue, Mr. Berry.
"Q Didn't you state on direct examination when you were testifying here yesterday that Mr. Tatum arrived and made known to you that Larry Hill would submit to the breath test and that you then informed Mr. Tatum that too much time had elapsed, wasn't that your testimony yesterday?
"MR. SIMPSON: We object, that's a cheap shot. He knows that is not the testimony of this witness. He knows that.
"THE COURT: You object to the question and I sustain it.
"MR. SIMPSON: We object.
"Q What did you say on direct examination about any discussion?
"MR. SIMPSON: Judge, he is asking this witness to go back and remember what he said on direct, exact words and he is here to testify. He can ask him, if it please the Court, what is he saying now, not what he said on direct. He can't remember and we object.
"THE COURT: Sustained.
"MR. BERRY: We except."
It is clear that the witness answered that he did not recall the information being inquired about by the appellant in his answer to the first question above. Thus, the questions which followed were merely repetitious; the witness had answered the questions and objection thereto was properly sustained. Bynum v. State, Ala.Cr.App., 348 So.2d 804 (1976); Browder v. State, 54 Ala.App. 369, 308 So.2d 729, cert. denied 293 Ala. 746, 308 So.2d 735; Wright v. State, 49 Ala.App. 539, 274 So.2d 95 and cases therein cited.
Appellant contends finally that the judge erred in the following ruling (R. 960):
"Q Did you not further tell Larry Hill on that occasion that you were taking his handcuffs off of him and if there was trouble down at the Emergency Room that he, Larry Hill, had your permission to run?

*318 "MR. SIMPSON: Judge, I object; now, you know as a matter of fact he did not say any such thing on direct examination, everybody in this Courtroom knows he didn't say any such thing.
"THE COURT: Sustained.
"MR. SIMPSON: Another cheap shot."
* * * * * *
"Q That's okay. You have answered my question. Did you state to Larry Hill on that occasion in substance and in effect that he was your prisoner?
"MR. SIMPSON: If it please the Court, I object to the attorney reading from a document he is holding in his hand, that nobody else has a copy of and we must trust Mr. Berry to
"THE COURT: I sustain it.
"MR. BERRY: We except, Your Honor."
The record, however, indicates the following question and answer (R. 962):
"Q Did you tell Larry Hill that when he got down there to the Emergency Room that he had your permission to run?
"A I did not tell him he had my permission to run, no, sir. I did advise him if there was any trouble that I would wish for him to get away, yes, sir."
Again, the substance of the objected to question was covered in the rephrased question, which was answered without objection. Hence, we find no harmful error.
We have examined appellant's other assignments of error and find them to be without merit.
A careful search of the record reflects no error injuriously affecting the substantial rights of appellant. The cause is due to be affirmed.
AFFIRMED.
DeCARLO and BOOKOUT, JJ., concur.
HARRIS, P. J., and BOWEN, J., concurred in result.

ORDER (ON REHEARING)
TYSON, Judge.
Request for additional statement of facts denied, application overruled, no opinion.
All the Judges concur.
HARRIS, P. J., concurred in result only.
NOTES
[1] Title 36, sections 154-58, Code of Alabama 1940 (Recomp.1958) (Supp.1973), were the provisions in effect at the time of the accident and trial.
[2] Appellant does not question the authority of the legislature to impose consent on motorists within the state.
[3] Appellant does not challenge the automatic suspension provision or the administrative procedure of sections 154(d) and (e).
[4] This provision applies to the states through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).
[5] However, the court upheld the admission of this evidence under the "well-established doctrine that, where a statement is made in the presence of a party accusing him of the commission of or complicity in a crime, his silence or failure to meet the accusation with a prompt and explicit denial may, under circumstances, warrant the inference of his acquiescence in the truth of the charge." 131 Ala. at p. 10, 31 So. at 571. Apparently the court found this rule of evidence more important than the defendant's constitutional privilege.