[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 764 
Burglary in the first degree; sentence, life imprisonment without parole (habitual offender).
The facts surrounding this conviction have been the subject of several prosecutions, both State and Federal. The companion case in State court is Tombrello v. State, 421 So.2d 1319
(Ala.Cr.App. 1982), and a related Federal case is United Statesv. Tombrello, 666 F.2d 485 (11th Cir. 1982). The following facts set out by the Court of Appeals for the Eleventh Circuit also summarize the State's evidence in the instant case:
 "On October 27, 1980, [appellant's co-defendant Sam] Tombrello telephoned an acquaintance, `Red' Gore, seeking assistance in planning a series of burglaries in Alabama. To achieve this purpose, Tombrello asked Gore's help in locating someone in the Chicago area skilled in safe cracking and disarming burglar alarms. Unfortunately for Tombrello, Gore, who was already in trouble with law enforcement officials promptly reported the conversation to the FBI. The next day, on October 29, 1980, Robert Martin, a special employee of the FBI posing as a member of the `Chicago syndicate,' called Tombrello to offer his support in the upcoming enterprise. Martin agreed to the monitoring and recording of the conversation. Tombrello, unaware of the caller's true identity, offered to fly to Chicago the next day to meet with his new partners. On October 29, 1980, Tombrello met in a hotel room at the Chicago airport with Martin and FBI Agent Robert Pecoraro and told of his plans to rob the store and residence of Thomas Summerville in Eutaw, Alabama. On the following day, October 30, 1980, Tombrello, who had returned to Alabama, again received a phone call from Martin and discussed the plan. On November 5, 1980, the group met again in Alabama. FBI Agent John Dolan and appellant Watson attended this meeting and Watson was introduced as the `mastermind' of the robbery of the Summerville home and store. All the details were worked out at this time. Everyone agreed that the robbery would take place the following day, November 6, 1980, and that Tombrello and Watson would procure the necessary guns. On November 6, 1980, Wright joined the band and provided two pistols which were to be used in procuring the cooperation of the Summervilles. At this session, it was agreed that one of the FBI agents would enter the residence first and then summon the others when the way was clear. While enroute to the Summerville home, Tombrello assured his Chicago associates that the theft would net $250,000.00 in cash as well as diamonds and gold. The conspirators also agreed that the loot should be `fenced' in Chicago. Upon arrival at the scene, everything went according to plan, except when the call came and the appellants arrived in the house they found themselves surrounded by well-armed FBI agents.
 "The conspirators, apparently abandoning the original idea of forcefully cracking the safe, needed Thomas Summerville's aid in providing the combination. To this end, they discussed torturing Mrs. Summerville as a means of securing his cooperation."
Appellant claimed that he and Tombrello were entrapped and never intended to burglarize the Summerville home. The entire purpose was an elaborate ruse to get money from Chicago syndicate men. *Page 765 
Tombrello testified that he had been led to believe by Red Gore that the syndicate people would advance him a great deal of cash if he could convince them he had planned a crime which required "front money." Tombrello claimed that he and appellant pretended to have planned the Summerville burglary and they "talked big" in order to impress the Chicago mobsters.
Also, appellant insisted that he did not know Tombrello was armed when they entered the Summerville residence.
 I
Appellant argues that he should have had court appointed counsel with at least five years' criminal law experience, according to § 13A-5-54, Code of Alabama 1975, since his potential sentence was life imprisonment without parole.
Section 13A-5-54, concerning capital offenses, requires that experienced counsel be appointed for "[e]ach person indicted for an offense punishable under the provisions of this article." Because appellant was not indicted for a capital felony and was not subject to a possible death sentence, the statute has no application to him. Thatch v. State, 432 So.2d 8
(Ala.Cr.App. 1983); Curtis v. State, 424 So.2d 679 (Ala.Cr.App. 1982).
 II
Appellant maintains that he was denied the effective assistance of counsel by his first attorney's inattention to his defense and by his second attorney's lack of time to prepare for trial. Regarding the latter claim, he asserts that his Sixth Amendment rights were violated by the trial court's failure to grant a motion for continuance. The following sequence of events is noteworthy:
 March 16, 1981 — Honorable Robert E. Upchurch was appointed to represent appellant.
 May 1981 — Upchurch sat in on the trial of appellant's co-defendant, Sam Tombrello, and heard all the testimony in the case.
 September 1981 — Appellant filed a grievance with the Alabama State Bar Association against Upchurch, alleging that the attorney had not conferred with him in jail often enough, or filed any pre-trial motions on his behalf.
 November 1981 — Appellant filed a pro-se motion for continuance and requested that new counsel be appointed to represent him.
 December 1, 1981 — Honorable William H. Traeger was appointed co-counsel, along with existing counsel, to represent appellant.
 December 2-4, 1981 — The following motions, signed by both Upchurch and Traeger, were filed in appellant's behalf:
1) Motion for continuance;
2) for change of venue;
3) for discovery and inspection;
4) to dismiss indictment;
5) to prohibit jury dispersal;
 6) to suppress acts or declarations made by co-defendants;
 7) to hire an expert to examine tape-recorded conversations;
8) to quash indictment;
9) for disclosure of impeaching information.
Appellant's first allegation, that Mr. Upchurch was ineffective because he did not confer often enough with appellant in jail or file any pre-trial motions, does not establish incompetency of counsel. As this court observed inBass v. State, 417 So.2d 582, 585 (Ala.Cr.App.), cert. denied,417 So.2d 588 (Ala. 1982):
 "[T]here is no rule stating that trial counsel's failure to file pre-trial motions constitutes per se
inadequacy of representation. The failure to act must cause the trial to be reduced to a farce, sham, or mockery of justice."
Similarly, counsel's failure to visit his client in jail as often as the client would like does not mean that the attorney is ineffective. The failure to confer with the prisoner must cause the trial to become a "farce, sham, or mockery," due to, for example, *Page 766 
the attorney's ignorance of the facts or omission to assert possible defenses. In this case, Mr. Upchurch's decision to attend the trial of his client's co-defendant demonstrated a high degree of concern and diligence.
The record in the instant case also reveals that Mr. Upchurch kept in touch with the attorney representing appellant in the federal prosecution, another indication of preparation for his client's defense. Thus, the allegations of incompetency are not supported by the record.
Likewise, the record reflects that appellant's attorneys had sufficient time to prepare for trial and no abuse on part of the trial court in denying the motion for continuance. In response to the argument that Mr. Traeger did not have time to review the voluminous transcripts of the co-defendant's trial or the federal prosecution, the judge observed that Mr. Upchurch had the opportunity to familiarize himself with both proceedings. Moreover, Mr. Traeger stated to the court that he had read the transcripts "two or three times." In reply to the contention that Traeger had not analyzed the F.B.I.-taped conversations with the appellant, the trial court noted that Upchurch had not only heard the tapes but had obtained transcribed copies of the recordings.
The trial judge acknowledged the difficulties existing between appellant and Mr. Upchurch, as evidenced by the grievance filed by appellant against Upchurch, but he concluded that appellant's interests would best be served by leaving Upchurch on the case. The trial court gave appellant the benefit of Upchurch's familiarity with the evidence presented in the companion cases while at the same time creating a buffer between appellant and Upchurch by appointing Traeger. This step was efficient and commendable. A review of the transcript for the three-day trial indicates that appellant's attorneys were diligent and resourceful. They conducted a vigorous defense by cross-examining the State's witnesses in detail and by calling witnesses for the defense. Accordingly, there was no abuse of discretion in the trial court's denial of the motion for continuance. See Childers v. State, 389 So.2d 193 (Ala.Cr.App. 1980); Wilson v. State, 384 So.2d 1243 (Ala.Cr.App. 1980).
 III
Appellant contends that the trial court erred by not granting a continuance to enable him to have a defense expert examine the tape recordings. He also argues that the tapes should not have been admitted because: 1) the recordings were not the originals; 2) a proper predicate for their introduction was not established; 3) the speakers on the tape were not correctly identified and the jury was not cautioned as to the reliability of the identification; and 4) certain racial slurs made by appellant should have been deleted from the recordings.
It is unnecessary to discuss these individual claims of error because a reading of the record as a whole indicates that the error, if any, of admitting the tapes was harmless. A.R.A.P. 45. Every element of the State's case was overwhelmingly proved by evidence other than the tape recordings. See Harris v.State, 428 So.2d 121 (Ala.Cr.App. 1981), affirmed,428 So.2d 124 (Ala. 1983).
Live testimony from the F.B.I. witnesses sufficiently established appellant's intent and predisposition to commit the crime of burglary, as well as the fact that appellant "knowingly and unlawfully enter[ed] . . . a dwelling . . . and he or another participant in the crime [was] armed with . . . a deadly weapon." Ala. Code § 13A-7-5 (1975). Compare UnitedStates v. Tombrello, 666 F.2d at 491 ("In view of the mountain of unimpeachable and thoroughly incriminating evidence, the admission of the tapes, even if error, was certainly harmless.").
 IV
Appellant insists that his motion for a new trial should have been granted because the evidence established that he was entrapped into committing the burglary. *Page 767 
The legal principles pertaining to the defense of entrapment were summarized as follows in Johnson v. State, 291 Ala. 639,640, 285 So.2d 723 (1973):
 "Entrapment occurs when State officers or persons under their control, incite, induce, lure, or instigate a person into committing a criminal offense, which that person would not have otherwise committed, and had no intention of committing."
The defense is not available when State agents merely provide an opportunity for the commission of an offense to an individual who already has the requisite criminal intent or predisposition to commit the charged offense. Jackson v. State,384 So.2d 134 (Ala.Cr.App. 1979), cert. quashed, 384 So.2d 140
(Ala. 1980); Tyson v. State, 361 So.2d 1182 (Ala.Cr.App. 1978).
Appellant contends that entrapment was shown by evidence that F.B.I. employee Robert Martin conceived the scheme for the Summerville burglary and later ordered appellant to enter the Summerville house. However, the uncontradicted evidence derived from the recorded conversations with F.B.I. agents posing as gangsters, as well as the live testimony of the agents themselves, established that appellant had been "casing" the Summerville home for months. Moreover, Martin's "order" or "invitation" for appellant to enter the Summerville house was all part of the prearranged plan to burglarize the premises.
The fact that appellant and his witnesses denied their intent to consummate the burglary presented a jury question. When there is a contradiction in the evidence, the defense of entrapment should be resolved by the jury. Tyson v. State, supra; Johnson v. State, supra; Demmon v. State, 46 Ala. App. 652, 248 So.2d 147 (1971). There was ample testimony indicating appellant's predisposition to commit the crime charged, and the jury's verdict was fully supported by the evidence on this issue.
 V
Burglary in the first degree is defined in § 13A-7-5, Code of Alabama 1975, as follows:
 "(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime:
(1) Is armed with explosives or a deadly weapon; or
 (2) Causes physical injury to any person who is not a participant in the crime; or
 (3) Uses or threatens the immediate use of a dangerous instrument." (Emphasis added.)
Contending that the statute requires a defendant's knowledge of his co-defendant's possession of a weapon, appellant based his defense at trial, in part, on the argument that he was neither armed nor aware that his co-defendant Tombrello had a weapon when they entered the Summerville residence. Appellant therefore excepted to the following instruction given by the trial court:
 "As I explained to you, it is not necessary in the indictment for the State to prove that the defendant had knowledge that a participant had a deadly weapon. That is not one of the elements. So, it is not necessary for the State to prove knowledge on the part of the defendant that a participant was armed with a deadly weapon. So, the three elements are as I gave you; that Floyd Leon Watson knowingly and unlawfully entered the dwelling of Thomas Summerville; second, in doing so, he acted with the intent to commit a crime within that dwelling, that is theft; third, that the participant was armed with a deadly weapon and the participant, being Sam Tombrello, was armed with a pistol. So, those are the three elements of burglary in the first degree."
In our judgment, the trial court's charge was a correct statement of the law. Alabama's burglary statutes are virtually identical to the language found in New York *Page 768 
Penal Law §§ 140.30 and 140.25 (McKinney Supps. 1981 and 1982), which are, in turn, based on the Model Penal Code § 221.1 (Proposed Official Draft 1962).
Under New York law, "lack of knowledge that [a defendant's] co-participant was armed is never a defense to . . . burglary."People v. Mann, 102 Misc.2d 1101, 424 N.Y.S.2d 1022, 1023
(N.Y.Sup.Ct. 1980) (quoting N.Y. Penal Law § 140.25 (McKinney Supp. 1982) (Practice Commentaries at 47-48)).
Likewise, under the Texas burglary statutes, which are also derived from the Model Penal Code, burglary is a second degree felony unless one of three aggravating circumstances is present, including the fact that "any party to the offense is armed with explosives or a deadly weapon." Tex. Penal Code Ann. § 30.02 (Vernon 1974). The commentary to § 30.02 points out that even if a defendant "takes precautions to ensure that other parties to the burglary are unarmed and nonviolent," he will, nevertheless, be guilty of first degree burglary if, in fact, any participant is so armed. Tex.Penal Code Ann. § 30.02
(Vernon 1974) (Commentary at 144).
We believe the New York and Texas constructions of the burglary statutes are persuasive not only because the laws of those jurisdictions are derived from the Model Penal Code, as are Alabama's, but also because, as the commentary to our own statute notes:
 "Burglary in the first degree, § 13A-7-5, is intended to conserve human life and not merely property. The section . . . recognizes the inherent danger to human life . . . when occurring under the life endangering circumstances enumerated." Ala. Code § 13A-7-5 through 13A-7-7 Commentary at 145.
When one burglar has a weapon, "the inherent danger to human life" is increased whether or not his fellow burglars are aware that he is armed.
This court's holding in Mallory v. State, 437 So.2d 595
(Ala.Cr.App. 1983), construing § 13A-8-41 (first degree robbery) and § 13A-2-23 (complicity) to require knowledge on the part of one robber that his confederate is armed, is not in conflict with this decision. Although the result in Mallory may be at odds, from a practical standpoint, with the decision reached here, the difference stems from the wording used by the legislature in defining the two offenses.
A person is guilty of first degree robbery if he uses or threatens the use of force against his victim and he is armed with a deadly weapon. In order for a non-armed fellow robber to be guilty of the first degree offense, therefore, he must be held accountable under principles of complicity, which require "intent" and "knowledge." See § 13A-2-23 (Commentary).
In drafting the first degree burglary statute, on the other hand, the legislature specifically imposed criminal liability, independently of the complicity statute, for all "participants" in the offense. Thus, we must conclude that the legislature intended to hold non-armed burglars to a higher standard of liability for the actions of their partners in crime than non-armed robbers. If this result is logically inconsistent, the remedy is with the legislative rather than the judicial branch of government.
 VI
Appellant contends that testimony from one of the State's witnesses regarding razor blades, which were removed from Tombrello at the scene, was improper. He maintains that since the indictment charged the use of a pistol as a deadly weapon in the burglary, the mention of razor blades was irrelevant and inflammatory. From the record:
 "Q. All right, sir. I believe you've already testified about taking the razor blades from Mr. Tombrello.
"A. Yes, those came from Mr. Tombrello?
"Q. And where, on Mr. Tombrello, were they?
 "MR. TRAEGER: Judge, we're going to object to that as not having anything whatsoever to do with his case being — It's highly inflammatory. He's not being *Page 769 
charged with possession of a razor blade. This has nothing to do with this particular defendant. We find that prejudicial to this defendant.
"THE COURT: Approach the bench.
"(Whereupon, the attorneys approached the bench.)
"THE COURT: State your objection for the record.
 "MR. TRAEGER: We object to any mention of any razor blades found in Sam Tombrello's wallet as being highly prejudicial and inflammatory as to this particular defendant. There is no testimony that came from this defendant. There is nothing to show that this defendant had any knowledge of their existence or any connection to them. The defendant is not charged with possession of razor blades. The only charge with which he has is burglary in the first degree, which he is charged with entering a building, knowing or possessing a .25 caliber weapon, not razor blades. He's been charged with going in to commit a theft, not to do anything with any razor blades. We object as being highly inflammatory and irrelevant to this particular defendant.
"THE COURT: Overrule the objection."
As the foregoing excerpt from the transcript demonstrates, the objection here was untimely. To be timely, an objection must be interposed as soon as the ground for the objection becomes apparent. Wynn v. State, 423 So.2d 294 (Ala.Cr.App. 1982); Etheridge v. State, 414 So.2d 157 (Ala.Cr.App. 1982).
Unless an objection comes before the question is answered, the trial court will not be put in error for overruling the objection if there has been no motion to exclude the answer.Streeter v. State, 406 So.2d 1024 (Ala.Cr.App.), cert. denied,406 So.2d 1029 (Ala. 1981).
 VII
Appellant maintains that the cumulative effect of several comments made by the trial court during the cross-examination of a State's witness was to support the credibility of the witness.
We have examined each instance complained of and we have found, first, that there were no objections to the court's statements and, second, that the comments were either casual remarks addressed to counsel and not to the jury, see Carpenterv. State, 400 So.2d 417 (Ala.Cr.App.), cert. denied,400 So.2d 427 (Ala. 1981), or that they were explanations by the trial judge of the reasons for his ruling, see Cooper v. State,393 So.2d 495 (Ala.Cr.App. 1981). None of the remarks was prejudicial to the appellant.
 VIII
Appellant claims that the District Attorney made six improper and prejudicial statements during closing argument. On four of these statements there was no objection by the defense, on one there was no adverse ruling by the trial court, and on the remaining statement the ruling was proper since the argument was a reply in kind to summation by the defense. See Proctor v.State, 391 So.2d 1092, 1094 (Ala.Cr.App. 1980).
 IX
Immediately before closing arguments by the attorneys, appellant blurted out, "Your Honor, I would like to be on the record that I was not allowed to take a lie detector test before this case." The trial judge responded, "You're going to be held in contempt of court, Mr. Watson. You're not allowed to address the court. That manner is improper."
Appellant contends that the comments by the trial court were too harsh and prejudiced him before the jury. We note, first, that there was no objection to the court's statement and, further, that "[i]t is the right and duty of the court in the administration of the law to maintain its dignity, and to this end exercise its power to preserve an orderly procedure, and to punish for an offense against it." Sims v. State, *Page 770 146 Ala. 109, 41 So. 413, 415 (1906). We find no error here.
 X
After the jury delivered its verdict to the court, appellant requested that the jury be polled. Appellant insists that the polling procedure used by the trial court reflected improprieties in the jury's deliberations and a misunderstanding of the trial court's instructions, thereby requiring a new trial.
We have carefully reviewed the polling procedure and we find no improprieties suggested. Instead, we commend the trial court for its able handling of the jury's uncertainty and sending them back for further deliberations once they indicated that the original verdict was not unanimous.
 XI
At the hearing to determine whether appellant should be sentenced as a habitual offender, the State introduced records of a 1959 Indiana conviction for robbery, three Texas convictions for robbery in 1965, and a 1961 Alabama conviction for assault with intent to rob, all carrying penalties of greater than one year. The trial court admitted proof of the Indiana and Alabama convictions, but ruled the Texas convictions inadmissible for lack of proper certification.
The court determined, however, that appellant's own testimony during the trial provided proof of the Texas convictions. Finding that appellant had been previously convicted of three prior felonies, the trial judge then sentenced him to life imprisonment without parole under § 13A-5-9 (c)(3), Code of Alabama 1975.
Appellant claims that in spite of his admission of the prior convictions, the State was required to prove that he had been represented by counsel at the time of the Texas convictions. However, once a defendant admits prior felony convictions, they are proved for purposes of the Habitual Felony Offender Act.Peoples v. State, 415 So.2d 1230, 1231 (Ala.Cr.App. 1982);Smith v. State, 409 So.2d 455, 459 (Ala.Cr.App. 1981); Douglasv. State, 406 So.2d 1051, 1052 (Ala.Cr.App.), cert. denied,406 So.2d 1053 (Ala. 1981).
 As the Supreme Court observed in Donahay v. State, 287 Ala. 716, 255 So.2d 599 (1971):
 "[W]hen a defendant, through his own counsel, freely admits his conviction of a crime, unless he qualifies his admission, he admits all of the ingredients needed to prove the conviction of the crime. . . . By his act of admitting the prior conviction, we think the defendant relieved the State from the burden of proving any of the matters that ordinarily would attend establishing the prior conviction." 287 Ala. at 718, 255 So.2d 599 (quoted in Nilson v. State, 412 So.2d 1262, 1263 (Ala.Cr.App. 1982)).
 XII
The Habitual Felony Offender Act does not impose cruel and unusual punishment, McDonald v. Massachusetts, 180 U.S. 311,21 S.Ct. 389, 45 L.Ed. 542 (1901); Watson v. State, 392 So.2d 1274
(Ala.Cr.App. 1980), cert. denied, 392 So.2d 1280 (Ala. 1981); and it is not an ex post facto law, Gryger v. Burke,334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); Williams v. State,393 So.2d 492 (Ala.Cr.App. 1981).
The judgment and conviction by the Greene Circuit Court is due to be affirmed.
AFFIRMED.
All the Judges concur. *Page 771