Edward Earl Simmons Hardeman was convicted of the murder of Bennie James Rembert and was sentenced to 30 years' imprisonment. He raises six issues on this direct appeal from that conviction.
 I
The appellant claims that the State violated the rule prohibiting the impeachment of one's own witness.
On voir dire examination at trial, Birmingham Police Officer Cetonia Parham testified that the appellant did not make any statement when he was initially arrested and that the appellant "did say some things to [her], they just didn't involve the condition of the knife." R. 254-55, 258, 266-67. On direct examination, she testified that the appellant "said nothing" to her at the scene. R. 283. Defense counsel did not cross-examine the witness and the witness was excused.
However, later in the trial, the prosecution recalled Officer Parham and the following occurred: *Page 61 
"Q. [Prosecutor] Did he say anything to you?
"A. He said, 'We haven't done anything.'
"Q. How did he say that?
"A. He said, 'We haven't done anything.'
 "MR. RELFE [defense counsel]: Just a minute, please, ma'am. When you say how did he say that, I'm going to object. I think that calls for a mental operation.
"THE COURT: I overrule as to that.
"MR. RELFE: Except." R. 404.
On cross-examination at this time, defense counsel questioned the officer about her apparently conflicting statements.
On appeal, the appellant claims that the State violated the rule prohibiting the impeachment of one's own witness. This issue was not preserved for review. No objection was made on this ground in the trial court.
 "The assignment of a single objection is a waiver of all other objections not assigned. Harbin v. State, 15 Ala. App. 57, 59, 72 So. 594 (1916). '[B]y assigning specific grounds of objection the defendant waived all others.' Gamble v. State, 19 Ala. App. 590, 591, 99 So. 662 (1924). A defendant is bound by the grounds of objection raised at trial and cannot change them on appeal. Watkins v. State, 219 Ala. 254, 255, 122 So. 610 (1929). '[I]f a party makes a specific objection upon untenable grounds, which is overruled, then he cannot appeal by assigning a tenable ground upon which the evidence is inadmissible.' [C. Gamble, McElroy's Alabama Evidence § 426.01(11) (4th ed. 1991)]."
Leonard v. State, 551 So.2d 1143, 1151-52 (Ala.Cr.App. 1989). Furthermore, the objection that was interposed was untimely. "To be timely, an objection must be interposed as soon as the ground for the objection becomes apparent." Watson v. State,439 So.2d 762, 769 (Ala.Cr.App. 1983). "When a question is asked of a witness calling for inadmissible matter, it is mandatory upon the party against whom it is offered to object after the question but before the answer. The effect of such a rule is that a timely objection is a condition precedent to assigning the admission of such an answer as grounds for error on appeal." C. Gamble, McElroy's Alabama Evidence, § 426.01(3) (4th ed. 1991).
 II
The appellant asserts that the prosecutor was improperly allowed to question defense witness Adam Gallion about allegedly irrelevant and collateral matters in an attempt to impeach the witness. The appellant cites six instances of alleged improper cross-examination in this regard.
"Q. And blacks were the object of your hate?
"A. Yes.
 "Q. That is the philosophy of the Confederate Hammer Skinheads, isn't it?
"A. No, that is not the philosophy.
 "MR. RELFE: I'm going to impose an objection. I think we are getting far afield from where we came. I know this is cross-examination.
 "THE COURT: Well, it is cross-examination. I'll overrule, but let's limit it somewhat." R. 522-23.
__________
 "Q. When you went down there to get in a fight, as you term it, you had a metal baseball bat, didn't you?
 "MR. RELFE: Judge, again, I impose an objection at this point. I think we are getting far afield of where we are coming from.
 "THE COURT: I would sustain as to that date." R. 530-31.
__________
 "Q. The fact of the matter is, you go down there to the fountain because there are a lot of interracial couples down there?
"A. No.
"MR. RELFE: Just a minute. I object to that.
"THE COURT: I'm going to sustain." R. 534.
__________
 "Q. In fact, every time Mr. Hardeman would start drinking he wanted to go . . . bashing, didn't he? *Page 62 
 "MR. RELFE: Judge, again, I'm going to object at this point in time.
"THE COURT: Overrule as to that.
"A. No." R. 534-35.
__________
 "Q. When you would hear Hardeman suggest going bashing and Lane trying to talk him down, were you there on the occasion when Earl Hardeman said to Mark Hamilton Lane, 'You are a pussy,' because he didn't want to go bashing with him?
 "MR. RELFE: Now, just a minute. I object at this point in time.
 "THE COURT: I'm going to sustain unless you can establish a date certain.
 "Q. (By Mr. Brown [the prosecutor]:) Well, I can't give you a certain date. Did you hear Hardeman tell Lane that in the spring of 1992?
 "MR. RELFE: Again, Judge, I'm going to object to that.
"THE COURT: I'll overrule as to that.
"A. No, I didn't." R. 535-36.
__________
 "Q. You don't remember. What do you have tattooed on your hands?
"A. My what?
"Q. Your hands?
"A. A letter.
 "MR. RELFE: Judge, I object to that. I don't think that has any relevance at this point in time.
"THE COURT: I'll sustain." R. 542.
There was no error in the action of the trial court. First, the issue now raised on appeal, improper impeachment, was never presented to the trial court in the form of a proper objection, and that issue is not preserved for this Court's review.Leonard, 551 So.2d at 1151-52. "The trial court may not be put in error for failure to rule on a matter which was not presented to it or decided by it." City of Rainbow City v.Ramsey, 417 So.2d 172, 174 (Ala. 1982).
Second, the trial court sustained defense counsel's objection in three of the six instances of alleged improper cross-examination. "It is familiar law that an adverse ruling below is a prerequisite to appellate review." CSX Transp., Inc.v. Day, 613 So.2d 883, 884 (Ala. 1993). Where the trial court sustains the defendant's objection, there is "no adverse ruling and nothing is preserved for our review." Rice v. State,611 So.2d 1161, 1164 (Ala.Cr.App. 1992).
Third, in the remaining three instances in which the trial court overruled the appellant's objection, the witness answered the question posed in the negative. "If there was any error in allowing the question, it was error without injury, as the answer was not unfavorable to [the] defendant." Braham v.State, 143 Ala. 28, 45, 38 So. 919, 925 (1905). "A negative response by a character witness to a question relating to the defendant's prior misconduct removes the possibility of any injury to the defendant." Hill v. State, 366 So.2d 296, 316
(Ala.Cr.App. 1978), affirmed, 366 So.2d 318 (Ala. 1979). " '[A] negative response from a witness to questions relating to the accused's prior misconduct is harmless.' Wyrick v. State, [409 So.2d 969, 974 (Ala.Crim.App. 1981) (emphasis omitted)];Yates v. State, 390 So.2d 32 (Ala.Crim.App. 1980). A negative answer to an improper question does not constitute reversible error. Young v. State, 416 So.2d 1109 (Ala.Crim.App. 1982);Wyrick v. State, supra; Barton v. State, 376 So.2d 756
(Ala.Crim.App.), cert. denied, 376 So.2d 761 (Ala. 1979); Scrogginsv. State, 341 So.2d 967 (Ala.Crim.App. 1976), cert. denied,341 So.2d 972 (Ala. 1977)." Reeves v. State, 456 So.2d 1156,1161 (Ala.Cr.App. 1984).
 III
The appellant claims that the trial court erred in denying his motion to sequester the jury.
After the jury had been selected and sworn, defense counsel requested "that this jury be sequestered during the course of this trial and up through and including their deliberations." R. 60. Defense counsel stated as his reason for this request the "tremendous amount of publicity" connected with this case. R. 60. The trial court denied the request with the following comments: *Page 63 
 "THE COURT: Based on the responses as given by the jurors [on voir dire], I didn't see anything which would cause the Court to be unduly concerned about publicity. Of course, any time there is publicity, the Court has to be concerned that the jury makes a determination as to the guilt or innocence based on the evidence.
 "However, there were several that responded that they had read, seen or heard something about the case. I don't think we had but one juror who said that she could not be fair and impartial. So based on the responses of the jurors, as previously polled during the voir dire, I would overrule. I'll give instructions and I'll impress upon them their responsibilities in that regard each time they are separated from the courtroom. So I'll overrule and I'll allow the jury to be separated.
 "However, if during the course of the trial I find that it is necessary to reconsider, then I will do so immediately." R. 61-62.
"In any prosecution for a noncapital felony, the trial court, in its discretion, may permit the jury trying the case to separate during the pendency of the trial." Rule 19.3(b)(1), A.R.Crim.P. The appellant has failed to demonstrate that the trial court abused its discretion in refusing to sequester the jury in this case.
 IV
The appellant contends that the trial court committed reversible error in its oral charge to the jury by refusing five of his written requested charges. He also maintains that the trial court did not properly define "that part of complicity dealing with 'the intent to promote or assist the commission of the offense.' " Appellant's brief at 27.
The appellant's objection was insufficient to preserve for review the refusal of his requested charges. Rule 21.2, A.R.Crim.P., states: "No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection." (Emphasis added.) Here, defense counsel's objection to the refusal of his requested charges was: "Judge, I would specifically object to the Court's not giving the defendant's written charges." R. 628. Defense counsel then recited the substance of each refused requested charge.
 "Under Rule 14, A.R.Cr.P.Temp. (now Rule 21.2, A.R.Cr.P.), to preserve alleged error in the refusal of requested charges, a defendant must not only object in a timely manner, he must 'state with particularity the grounds of [his] objection.' Matkins v. State, 497 So.2d 201, 203
(Ala. 1986) (emphasis omitted). An objection which merely asserts that refused charges are correct or accurate statements of law does not meet this requirement. Connolly v. State, 539 So.2d 436, 438
(Ala.Cr.App. 1988); Bogan v. State, 529 So.2d 1029, 1031 (Ala.Cr.App. 1988). Cf. Ex parte Washington, 448 So.2d 404, 406 (Ala. 1984) (in order to preserve alleged error in the trial court's oral charge, an 'objection must be specific enough to point out the alleged error so as to allow the judge to correct [that] error'); Petite v. State, 520 So.2d 207, 213 (Ala.Cr.App. 1987) (same)."
Jones v. State, 591 So.2d 569, 573 (Ala.Cr.App. 1991).
However, assuming that the objection was adequate to preserve the issue for review, we conclude that the requested charges[1] were properly refused because the *Page 64 
principles defense counsel was attempting to express in those requested charges were covered in the oral instructions of the trial court. The trial court instructed the jury on the principles of intent with regard to both murder and reckless manslaughter, R. 614, 615-16; on the principles of complicity, R. 618-20; that "[m]ere presence at the scene of a crime without more cannot make an accused a party to the crime," R. 620; and that "[k]nowledge of the commission of a felony after its commission without aid being rendered to the active felon in the commission is not sufficient to authorize a conviction." R. 620. "The refusal of a requested written instruction . . . shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge." Rule 21.1, A.R.Crim.P.
Defense counsel did object to the trial court's charge on complicity:
 "As to the Court's oral charge concerning complicity, toward the end of the, in fact, the last of the Court's charge, which stated, as best I can remember, that such facts as the defendant's presence in connection with his companionship, his conduct at, before or after the commission of the act are circumstances [from] which participation may be inferred. I would respectfully request the Court to charge, not only that, but [are] circumstances [from] which participation may or may not be inferred." R. 631.
On appeal, the appellant complains that the trial court never instructed the jury that in order to be found guilty as an accomplice the appellant had to have an intent to promote or assist the commission of the offense. However, this objection was never presented to the trial court and the issue, therefore, was not preserved for review. Furthermore, the trial court did, in defining complicity, instruct the jury that "[a] person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense, he procures, induces or causes such other person to commit the offense, or he aids or abets such other person in committing the offense." R. 618. This instruction follows verbatim the statutory definition of complicity applicable to this case. Ala. Code 1975, §13A-2-23(1) and (2).
We find no error in the oral instructions of the trial court.
 V
The appellant contends that the evidence is not sufficient to support his conviction because, he says, the State presented no evidence that he acted in concert with any of the codefendants. We find this argument without merit.
The State presented evidence that early on the morning of April 18, 1992, sometime after 12:00 midnight, the appellant went "bashing" with Malcolm Samuel Driskell[2], Mark Hamilton Lane[3], and C.W. The term " 'bashing' meant to go out and beat up somebody that was non-white, homosexual or in an interracial relationship." R. 174. The appellant participated in planning the bashing. Driskell, Lane, and the appellant were "skinheads" and members of the "Confederate Hammer Skinheads." Lane and C.W. were juveniles.
The body of Bennie James Rembert was discovered around 3:50 on the morning of April 18, 1992. The cause of death was a stab wound to the chest. The victim was black. At around 3:30 that same morning, the automobile in which the appellant and his three companions were traveling was stopped *Page 65 
after a police officer determined that a large bone-handled knife covered with fresh blood had been thrown from a window of that vehicle. The knife had been thrown from the passenger side window of the two-door car. The appellant was sitting on the passenger's side of the front seat. The appellant was arrested for public intoxication.
At the time of his arrest, the appellant was carrying "several different types of cards" referring to the "Aryan nation" and "white supremacy." R. 289. A police officer testified that at the police station the appellant was talking "about how that [whites] were going to come back and take over Birmingham, Birmingham was going to be their place." R. 289. The appellant called one police officer a "black fucking nigger." R. 287. Although the officer told the appellant to be quiet, the appellant "was still kind of verbal about talking about the white supremacy and how they were right and how black people were dumb and stupid." R. 290.
In his statement to the police, the appellant denied that he had prior knowledge that someone was going to be killed. He stated that he started running when he saw Lane raise the knife and attempt to stab the victim. The appellant claimed that Lane was his "best friend." The appellant also stated that he was drunk and "panic stricken" when he saw the knife.
There was evidence that the blood on the knife could have been the victim's. The knife belonged to a resident at a house where the appellant and his companions had been before going "bashing" and in which Driskell and Lane resided.
We find that this evidence was sufficient to present jury questions on the appellant's intent and his participation in the crime. "The test to be applied [in reviewing a conviction based on circumstantial evidence] is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Cumbo v. State,368 So.2d 871, 874 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). See also Ex parte Mauricio, 523 So.2d 87, 91-93 (Ala. 1987); Dolvin v. State, 391 So.2d 133, 137-38 (Ala. 1980);White v. State, 546 So.2d 1014, 1016-18 (Ala.Cr.App. 1989). "[W]e must view the circumstantial evidence in the light most favorable to the prosecution." Ex parte Bailey, 590 So.2d 354,357 (Ala. 1991).
 VI
The appellant contends that his statement to the police was involuntary and should not have been admitted into evidence. He asserts that his statement was coerced and was the product of an unlawful arrest or, in the alternative, an unlawful detention.
The appellant and his companions were arrested around 3:30 on the morning of April 18, 1992. Initially, the appellant was charged with public intoxication, an offense classified as a violation. Ala. Code 1975, § 13A-11-10(b). The appellant was also charged with the misdemeanor offense of carrying a concealed weapon because a knife had been thrown from the passenger window where the appellant was sitting. R. 262.
The appellant was taken to the police station before being taken to the city jail. At the station, around 3:50 or 3:55 that morning (R. 290), the appellant called Birmingham Police Officer Roger Thomas, a "black fucking nigger" (R. 287), while Thomas was writing the report. Thomas testified that the appellant was talking
 "about how that they were going to come back and take over Birmingham, Birmingham was going to be their place, and before he knew it he had called me a nigger to my face, and I just kept writing my report. . . . I told him, I instructed him to be quiet, but he was still kind of verbal about talking about the white supremacy and how they were right and how black people were dumb and stupid." R. 289-90.
The appellant was then charged with harassment. R. 262.
The victim's body was discovered around 3:50 that same morning. Initially, it appeared that the victim had been "run over" by a train and that his death had been caused by an "industrial accident." However, Birmingham Police Sergeant Curtis Mitchell, Jr., who investigated the death, *Page 66 
subsequently determined that the victim's death had been a homicide. R. 70.
Sergeant Mitchell arrived at the scene around 4:00 a.m. and remained there for four or five hours. Around noon, he went to the east precinct police station and "was informed of some information pertaining to a knife on a traffic stop." R. 71. Bond had been set for the appellant. R. 74-5. Around 2:00 that afternoon, Sergeant Mitchell examined the bone-handled knife retrieved by other officers. Sometime later, he requested that the adults — the appellant and Driskell — be brought to the station for an interview. At that time, the homicide investigation centered on the appellant. R. 78. However, no murder charges had been filed. R. 79.
Mitchell advised the appellant of his constitutional rights at 4:27 on the afternoon of April 18, 1992, and the appellant signed a written waiver of rights form. Although Mitchell's answers to particular questions during his trial testimony are misleading when taken out of the context of his entire testimony, the substance of Mitchell's testimony in this regard was that the appellant voluntarily agreed to talk with him but claimed that he did not know anything about the murder.
When Mitchell advised the appellant of his rights, the appellant was being held on two misdemeanor charges, carrying a concealed weapon and harassment. Because the appellant was also charged with public intoxication, jail procedure required that he be held for three or four hours. R. 97. Mitchell testified that at the time he advised the appellant of his rights, the appellant was still in jail because he either "couldn't or didn't make bail as of this time, 4:27, and that is the only reason he was in the Birmingham City Jail." R. 101.
After his interview with the appellant, Mitchell notified his supervisor and was instructed to "obtain" a "[f]elony extension as far as charging Mr. Hardeman with the crime." R. 88. Mitchell testified that his reason for getting an "extension" to keep the appellant in jail was "[b]ased upon the information I got from patrol officers that were involved in a traffic stop, and information I had received from reading the reports, and the information from Sergeant Howell King." R. 80. A judge granted the "extension." R. 89.
Mitchell advised Birmingham Police Department homicide investigator Steve Corvin that he had probable cause to believe that the appellant and Driskell were involved in the homicide. R. 94-95. Mitchell also advised Corvin that there was a possibility that the appellant would not talk to Mitchell about the homicide because Mitchell was black. R. 105.
The appellant's statement was taken around 7:30 on the evening of April 18, 1992, at the city jail by Investigator Corvin. Corvin testified that he informed the appellant of his constitutional rights and testified to the effect that the appellant knowingly, intelligently, and voluntarily waived those rights. The appellant signed a second written waiver of rights form.
The appellant presented testimony that his statements were involuntary, that he was repeatedly denied his right to counsel, and that he was illegally held on misdemeanor charges while the police were investigating the murder.
We find that the evidence supports the finding of the trial court that the appellant's statement was not the product of coercion and was therefore voluntary.
 "The standards for appellate review of a trial judge's determination of the admissibility of a confession are as follows: (1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) 'The admissibility of confessions is for the court, their credibility is for the jury.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. '(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This *Page 67 
finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala. 1977), and cases cited therein. 'Review of the court's action is limited to determining whether its finding was clearly erroneous.' United States v. Greer, 566 F.2d 472, 473 (5th Cir. 1978)."
Williams v. State, 461 So.2d 834, 838 (Ala.Cr.App. 1983),reversed on other grounds, 461 So.2d 852 (Ala. 1984). See alsoDixon v. State, 588 So.2d 903, 908 (Ala. 1991), cert. denied,502 U.S. 1044, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992). Applying these principles to the facts of this case, we conclude that the appellant's statement was voluntary.
The appellant's statement was not the product of an illegal arrest. The evidence presented by the state is adequate to show that the police had sufficient probable cause to arrest the appellant for public intoxication. The State's evidence shows that when the police stopped the automobile in which the appellant was riding, the appellant voluntarily, and before being asked or directed to do so, got out of the car. R. 254. The appellant did not obey the command of the arresting officer to lie flat on the ground on his stomach. Instead, the appellant "pulling his knees up and putting his arms, bringing his arms to his body." R. 254. There was testimony that the appellant "continued to ball his legs up and pull his arms toward his body like he was going to get up off the ground." R. 281. The appellant exhibited "[s]lurred speech" and "smelled of alcoholic beverage, and his eyes were bloodshot." R. 259.
Officer Thomas testified as follows regarding what happened when the officers stopped the automobile:
 "At that time they had started exiting, all the people that were in the car, exiting the vehicle. Upon when [sic], we started getting out the car we told them to get on the ground, and they would start talking and shouting and talking about they wasn't doing nothing wrong and y'all just stopping us because we are white, and so on." R. 286.
Thomas testified that the appellant "said he wasn't doing anything wrong and he didn't feel that he — he was not going to get on the ground." R. 287.
"A person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity." Ala. Code 1975, § 13A-11-10(a). Although the evidence presented by the State may not have been sufficient to sustain a conviction for public intoxication, that same evidence was sufficient to provide the officers with probable cause to arrest the appellant for that offense. See Parks v. Director, State Department of PublicSafety 592 So.2d 1066, 1067 (Ala.Civ.App. 1992) ("[a]n acquittal in a DUI case [is] not synonymous with an unlawful arrest"; "there [may] be a lawful arrest even though there is a finding of 'not guilty' of the offense charged"). " 'Probable cause' does not mean that the officers must possess enough evidence in admissible form to convict the person whom they arrest or search." Yeager v. State, 281 Ala. 651, 653,207 So.2d 125, 127 (1967), quoting Patenotte v. United States,266 F.2d 647 (5th Cir. 1959).
 "Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime. 'In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not *Page 68 
legal technicians act. . . .' ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." ' 'Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.' The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause."
Dixon v. State, 588 So.2d 903, 906 (Ala. 1991) (citations omitted), cert. denied, 502 U.S. 1044, 112 S.Ct. 904,116 L.Ed.2d 805 (1992). An officer need not have enough evidence or information to support a conviction to have probable cause to arrest. See Brinegar v. United States, 338 U.S. 160, 175,69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Spinelli v. UnitedStates, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637
(1969).
Because the police had probable cause to arrest the appellant for public intoxication, we need not determine whether the police also had sufficient probable cause to arrest the appellant for carrying a concealed weapon and harassment.
Finally, we conclude that the appellant's statement was not the product of any unlawful detention. The appellant was arrested around 3:30 on the morning of April 19, 1992. His statement was taken around 7:30 that evening, some 16 hours after his arrest. Although at the time the statement was made, the appellant had been arrested for and charged only with two misdemeanor offenses and an offense classified as a violation, the police had probable cause to believe that he was involved in a murder. That information, apparently, was presented to a judge, who authorized an "extension" of his detention.
It appears that the police did have probable cause to believe that the appellant was involved in a murder and that his detention was authorized on that ground. It also appears that a judicial determination was made that the police did have reason to hold the appellant. However, the record does not reveal what type of determination was made and it is not clear to this court that it constituted a judicial determination of probable cause.
The appellant testified that he had $80 at the time of his arrest and that his bail would be $90 for the two misdemeanor charges and the public intoxication charge. The appellant's stepfather told him that he would not be able to bring the appellant $10 until the next day. R. 129-30. Although an "extension" had been granted to allow the police to continue to hold the appellant, there was testimony that the appellant remained in jail not because of the extension, but because he could not make his bond. R. 101. There is evidence to support the trial court's implicit finding that the appellant was not denied bond and that he was not held in violation of Rule 4.3(a), A.R.Crim.P.
We issue a strong caution that there is no authority for an "extension" regarding the investigative detention of any suspect in a criminal case. The "48-hour rule" of Rule 4.3(a)(1)(iii), A.R.Crim.P., is not an authorization to hold any defendant up to a maximum of 48 hours for investigation. The 48-hour period originated in County of Riverside v.McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), in which the United States Supreme Court held that the police cannot hold an accused who has been arrested without a warrant for more than 48 hours without taking the accused before a judge or magistrate. "[T]he Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Gerstein v.Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54
(1975). "It would be a mistake for law enforcement officers, judges and magistrates to assume that they can, with impunity, hold everyone arrested without a warrant for at least 48 hours (Rule 4.3(a)) or 72 hours (Rule 4.3(b)), respectively." H. Maddox, Alabama Rules of Criminal Procedure § 4.0 at 46 (Supp. 1993). *Page 69 
For the reasons expressed above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The requested charges are as follows:
 1. "In order to convict the defendant of murder, you must find the defendant had the intent to commit that specific crime. Summleor v. State, 582 So.2d 606 [(Ala.Cr.App. 1991)]." C.R. 40.
 2. "In order to convict the defendant of manslaughter, you must find the defendant had the intent to commit that specific crime. Summleor v. State, 582 So.2d 606." C.R. 41.
 3. "Mere presence at the scene of a crime, without more, cannot make an accused a party to a crime, that being the law of complicity." C.R. 42.
 4. "Knowledge of the commission of a felony, after its commission, without aid being rendered to the active felon in the commission of the felony, is not sufficient to authorize a conviction, that being the law of complicity." C.R. 43.
 5. "If there is no prearrangement or preconcert [sic] between persons charged with crime, mere presence of one of them to give aid if necessary is not 'aiding and abetting' unless the principal knew of such presence with intent to aid. Wright v. State, 333 So.2d 215 [(Ala.Cr.App. 1976)]." C.R. 44.
[2] Driskell was convicted of murder in a separate trial. That conviction was affirmed without opinion on direct appeal.Driskell v. State, [Ms. 92-1963, June 17, 1994] (Ala.Cr.App. 1994).
[3] Lane was tried as an adult and was convicted of manslaughter in a separate trial. That conviction is on direct appeal. Lanev. State, CR 93-722 (Ala.Cr.App.).